**Ruby CLARK, Plaintiff-Appellant,**

v.

**AMERICAN BROADCASTING COMPANIES, INC., Defendant-Appellee.**

**No. 80–1476.**

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 3, 1981.

Decided July 29, 1982.

Order of Oct. 22, 1982.

Rehearing Denied Nov. 3, 1982.

Victoria C. Heldman, Schaden & Heldman, Detroit, Mich., for plaintiff-appellant.

Richard E. Rassel, Butzel, Long, Gust, Klein and Van Zile, Detroit, Mich., for defendant-appellee.

Before KEITH and JONES, Circuit Judges, and BROWN, Senior Circuit Judge.

KEITH, Circuit Judge.

This appeal raises the question of whether summary judgment was providently granted in this defamation action. A judge of the United States District Court for the Eastern District of Michigan granted summary judgment for the American Broadcasting Companies, Inc. ("ABC"), the defendant-appellee. The court held that an ABC broadcast which pictured Ruby Clark, the plaintiff-appellant ("Plaintiff"), was not libelous. We reverse and remand for proceedings consistent with this opinion.

## FACTS

This defamation action arises from an ABC broadcast which aired on April 22, 1977. The broadcast was an hour long "ABC News Closeup" entitled: "Sex for Sale: The Urban Battleground" ("Broadcast"). The Broadcast addressed the effects of the proliferation of commercialized

sex: 1) the damage that sex-related businesses have on America's cities, towns, and neighborhoods; 2) the resurgence of street prostitution caused by these sex businesses; and 3) how the sex businesses flourish from prostitution. The Broadcast featured interviews which focused on various cities, including Boston, New York, and Detroit.

Act III focused on street prostitution in these cities. One segment of Act III focused on the devastating effect of street prostitution on a middle class neighborhood in Detroit. Residents of the neighborhood were interviewed, and several women were photographed as they walked down a public street.

The first woman was white. She was obese, and approximately fifty years old. She wore a hat, and carried a shopping bag in each hand. The second woman carried a grocery bag. She was black. The camera followed her a few minutes as she exited a grocery store and walked down the street. She was slightly obese, wore large-framed glasses, and appeared to be at least forty years old. The following comments were made while these two women appeared on the screen:

According to residents, and Detroit police records, most of the prostitutes' customers or johns were white; the street prostitutes were often black. This integrated middle class neighborhood became a safe meeting place for prostitutes and 'johns'.

The plaintiff, a black woman, was the third woman photographed walking down the street. The photographs were frontal close-ups. Plaintiff's face was clearly visible. The plaintiff appeared to be in her early to mid-twenties. She was attractive, slim, and stylishly dressed. She wore large earrings and had long hair which was pulled up above her head. Apparently, Plaintiff was unaware that she was being photographed. As Plaintiff appeared, the narrator made the following remarks:

But for black women whose homes were there, the cruising white customers were an especially humiliating experience.

Sheri Madison, a black female resident of the neighborhood plagued by prostitution, appeared on the screen seconds after Plaintiff. She stated:

Almost any woman who was black and on the street was considered to be a prostitute herself. And was treated like a prostitute.

Subsequently, Plaintiff initiated an action in the Wayne County Circuit Court against ABC claiming defamation and invasion of privacy. She claimed that the Broadcast depicted her as a "common street prostitute". It is uncontroverted that Plaintiff has never been a prostitute. In fact, Plaintiff is married and has one son. ABC removed the case to federal district court pursuant to the court's diversity jurisdiction.

In a deposition, Plaintiff testified concerning her reactions as she, her husband, and 2 year old son viewed the Broadcast. The Broadcast shocked her. Plaintiff believed that she had been portrayed as a prostitute. She also testified that several friends, acquaintances, and relatives phoned Plaintiff during and following the Broadcast. Each of these persons thought that the Broadcast portrayed her as a street prostitute.

Plaintiff also testified that she was propositioned, that church members shunned her, and that acquaintances confronted her with allegations that she was a prostitute. Moreover, after the Broadcast two potential employers refused to hire Plaintiff because they feared her employment would hurt their businesses.[1]

Both parties moved for summary judgment. In support of its motion, ABC argued that: 1) the audio and visual portions of the Broadcast were clear, unambiguous and not in dispute; 2) the pictures of the

---

1. In addition to Plaintiff's deposition, the parties engaged in other forms of discovery. The parties obtained two sets of interrogatories from each other. Plaintiff deposed Pam Hill, the writer, director, and producer of the Broad-cast. Moreover, Plaintiff provided ABC with the names of at least nine individuals who viewed the Broadcast and thought Plaintiff was portrayed as a prostitute. However, these potential witnesses were never deposed.

Plaintiff walking along a public street were not objectionable; 3) the "context and the words used in conjunction with the brief visual references" to the Plaintiff did not support her claim; and 4) the "balance of the [Broadcast] was not 'of and concerning' [the Plaintiff]." ABC attached to its Motion for Summary Judgment a transcript of the words used in the Broadcast. ABC also provided the court with a videotape of the Broadcast.

In her motion, Plaintiff asserted that: 1) there was no factual question that the defamation was "of and concerning" her; and 2) the Broadcast was not in the public interest, therefore, ABC could not assert a qualified privilege.

ABC filed an Answer to Plaintiff's Cross Motion for Summary Judgment, arguing that: 1) the Plaintiff was clearly and unambiguously depicted as a housewife; and 2) the Broadcast was in the public interest and a qualified privilege existed as a matter of law.

After viewing the videotape of the Broadcast and reading the accompanying transcript, the district court granted ABC's motion for summary judgment. Plaintiff perfected this appeal.

## I. DEFAMATION CLAIM

On appeal, Plaintiff argues that the district court erred in granting summary judgment for ABC since there existed a factual question as to whether the broadcast was defamatory. We agree.

In granting ABC's motion for summary judgment, the district court concluded that the Broadcast was not libelous. The court reasoned that nothing in Plaintiff's appearance suggested that her activity paralleled that of a street prostitute.[2]

---

**2.** The district court did not reach the issue of whether ABC was protected by a qualified privilege. The court did hold, however, that the Broadcast was in the public interest.

**3.** Rule 56(c), Fed.R.Civ.P. provides:
Motion and Proceedings Thereon. The motion shall be served at least 10 days before the time fixed for the hearing. The adverse party prior to the day of hearing may serve opposing affidavits. The judgment sought shall be rendered

ABC argues that courts must be cautious in allowing juries to decide defamation cases which involve public interest reporting. In effect, ABC suggests that different rules and considerations apply to summary judgment motions in defamation cases. However, the standard for summary judgment motions is articulated clearly in Fed.R.Civ.P. 56(c). Rule 56(c) provides that summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.[3]

"There is no rule which favors either granting or denying motions for summary judgment in defamation cases." *Schultz v. Newsweek, Inc.*, 668 F.2d 911 (6th Cir. 1982); *See Yiamouyiannis v. Consumers Union of United States*, 619 F.2d 932 (2d Cir.), *cert. denied*, 449 U.S. 839, 101 S.Ct. 117, 66 L.Ed.2d 46 (1980). Therefore, even in defamation cases, summary judgment is proper only if there exists no genuine issue as to any material fact.

In determining whether there exists a genuine issue as to a material fact, we apply the substantive law of Michigan. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The Michigan Supreme Court in *Nuyen v. Slater*, 372 Mich. 654, 127 N.W.2d 369 (1964), defined defamation as follows:

> A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.

*Id.* at 662, 127 N.W.2d 369.

This definition provides the applicable substantive law in this case.

forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.

■ The district court had a duty to determine as a matter of law whether the Broadcast was reasonably capable of a defamatory interpretation. *Schultz v. Reader's Digest Association*, 468 F.Supp. 551, 554 (E.D.Mich.1979); *Michigan United Conservation Clubs v. CBS News*, 485 F.Supp. 893 (W.D.Mich.1980), *aff'd*, 665 F.2d 110 (6th Cir. 1981). Whether the Broadcast was understood as being defamatory was for the jury to decide. *Schultz v. Reader's Digest*, 468 F.Supp. at 554; *Michigan United Conservation Clubs*, 485 F.Supp. at 902.

■ As noted, the district court granted summary judgment in favor of ABC because the court concluded that the broadcast was not libelous. The district court applied an incorrect standard. The district court should have granted summary judgment for ABC only if the Broadcast was not reasonably capable of a defamatory meaning. *Schultz v. Readers Digest*, 468 F.Supp. at 554; *Michigan United Conservation Clubs*, 485 F.Supp. at 902.

■ The portrayal of Plaintiff as a prostitute would clearly be defamatory under Michigan law. Prostitutes are considered immoral and socially undesirable. Moreover, as the Broadcast indicated, the presence of street prostitution in a neighborhood causes devastating social problems. There is often a significant increase in the number of assaults and robberies. App. 28. Street prostitution is also accompanied by the presence of illegal drug traffic. App. 30. Therefore, the portrayal of an individual as a prostitute would damage her reputation and tend to cause third persons not to associate with that individual.

■ In this case, Plaintiff's appearance in the Broadcast was capable of at least two interpretations, one defamatory and the other non-defamatory. That the Broadcast is reasonably capable of a non-defamatory meaning is clear from the district court's reasoning. The district court focused solely on whether Plaintiff's behavior during the Broadcast was similar to the stereotypical actions commonly associated with prostitution. This stereotypical behavior includes "[wearing] suggestive clothing, suggestive walking, overt acts of solicitation, and the like." App. 399. Plaintiff was not engaged in any of these actions. Consequently, the court concluded that Plaintiff's appearance in the Broadcast was not libelous.

Plaintiff's participation in the Broadcast is also reasonably capable of a defamatory meaning. The district court should also have viewed Plaintiff's appearance in the context of the focus on street prostitution. Viewed in this manner, Plaintiff was either portrayed as a prostitute or could reasonably be mistaken for a prostitute.

As noted earlier, Plaintiff was photographed as she walked down the street. Prior to Plaintiff's appearance, the commentator noted that the street prostitutes were often black while their customers were often white. Moreover, the commentator noted that this neighborhood was a safe meeting place for the black street prostitutes and their white customers. As the commentator spoke two women were pictured. The first woman was white. She was obese, at least fifty years old, and carried a shopping bag in each hand. This woman appeared to be one of the residents of the middleclass neighborhood. The second woman shown was black, slightly obese, wore large-framed glasses, and carried a bag of groceries as she exited a store. Although this woman was black, she also appeared to be one of the residents of the middle class neighborhood. Plaintiff's picture appeared immediately following the appearance of these two matrons.

The contrast between Plaintiff's appearance and that of the two matrons is striking. Plaintiff is black and appeared to be in her early to mid-twenties. She was slim, attractive, stylishly dressed, and wore large earrings. When her appearance is juxtaposed with that of the two matrons, it is not clear whether she is a resident of this middle class neighborhood or one of the street prostitutes who plagued this community. Arguably, this ambiguity is clarified by the commentator's statement that the presence of the cruising white customers was a humiliating experience for the black women

who resided in the neighborhood. However, assuming *arguendo* that this statement tends to clarify the ambiguity, this partial clarification is negated by an interview which followed Plaintiff's appearance.

Immediately following Plaintiff's appearance, Sheri Madison, a resident of this neighborhood, appears on the screen and states: "Almost any black woman on the streets was considered to be a prostitute herself, and was treated as a prostitute." App. 73. Thus, it is unclear whether Plaintiff is one of those middle class women erroneously considered to be a prostitute or is, in fact, a prostitute.

The ambiguity created when Plaintiff's appearance is viewed within the context of Act III's focus on the effect of street prostitution on a Detroit middle class neighborhood renders the Broadcast susceptible to both a defamatory and a non-defamatory meaning.

Given the district court's own analysis of the question of whether the broadcast was defamatory, the court's decision to grant summary judgment for ABC is difficult to reconcile. The district court noted that it had "agonized over [whether the broadcast defamed Plaintiff]." App. 400. The fact that the court found it necessary to agonize over the question of whether the Broadcast was defamatory demonstrates that the case should have been submitted to the jury.

The Broadcast was reasonably capable of two meanings, one defamatory and the other non-defamatory. Consequently, it was for the jury to decide whether the Broadcast was understood as being defamatory. *Schultz v. Readers Digest*, 468 F.Supp. at 554; *Michigan United Conservation Club*, 485 F.Supp. at 902. We therefore conclude that summary judgment was improvidently granted.

## II. QUALIFIED PRIVILEGE UNDER MICHIGAN LAW

ABC contends that a qualified privilege protects it even if the Broadcast was capable of a defamatory meaning. Michigan's qualified privilege protects a defendant from liability even where the statements published were defamatory. A defendant loses the protection of the qualified privilege, however, if it acts with actual malice as defined in *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). *Schultz v. Newsweek*, 668 F.2d at 918; *Lawrence v. Fox*, 357 Mich. 134, 97 N.W.2d 719 (1950) In *New York Times v. Sullivan*, the Supreme Court held that a defendant acts with actual malice where a statement is made with knowledge that it is false or with reckless disregard of whether it was false or not. *Id.* 376 U.S. at 280, 84 S.Ct. at 726. The record in the instant case does not indicate that ABC acted with actual malice. Therefore, if Michigan's qualified privilege applies in this case, we could sustain the district court's grant of summary judgment for ABC.

Plaintiff argues that Michigan's qualified privilege does not apply in this case, therefore, she is required to prove only that ABC was negligent.[4]

The parties' contentions raise difficult issues of state and constitutional law. State defamation law is affected by First Amendment principles. *See Schultz v. Newsweek*, 668 F.2d at 916; *Orr v. Argus Press Co.*, 586 F.2d 1108 (6th Cir. 1978), *cert. denied*, 440 U.S. 960, 99 S.Ct. 1502, 59 L.Ed.2d 773 (1979). Moreover, as a legal and practical

---

**4.** Plaintiff argues that the *New York Times v. Sullivan* standard is not applicable in this case because she is not a "public figure". The Supreme Court has held that the constitutional privilege embodied in the *New York Times v. Sullivan* standard is not applicable to private individuals who are not "public figures". *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). The Court in *Gertz* also held that "so long as they do not impose liability without fault, the States may

define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehoods injurious to a private individual." *Id.* at 347, 94 S.Ct. at 3010.

In *Schultz v. Newsweek, Inc.*, 668 F.2d 911 (6th Cir. 1982), this Court held that Michigan's privilege applies "even though the plaintiff is a private individual". Therefore, if the qualified privilege applies, even a private individual must prove "actual malice" as defined in *New York Times v. Sullivan*.

matter, the state law issues and the constitutional issues may be intertwined in some situations. *See Orr*, 586 F.2d at 1112. We will address the issues arising under Michigan law first, and will reach the constitutional issues only if required to do so. *Cf. Schultz v. Newsweek*, 668 F.2d at 916.

■ The Michigan Supreme Court recognized a qualified privilege to publish defamatory statements in the seminal decision of *Bacon v. Michigan Central R. Co.*, 66 Mich. 166, 33 N.W. 181 (1887). In *Bacon*, the court held that the qualified privilege:

> extends to all communications made bona fide upon any subject matter in which the party communicating has an interest, or in reference to which he has a duty, to a person having a corresponding interest or duty. And the privilege embraces cases where the duty is not a legal one, but where it is a moral or social character of imperfect obligation.

*Id.* at 170, 33 N.W. 181.

Whether the qualified privilege applies is a question of law. *Fortney v. Stephan*, 237 Mich. 603, 213 N.W. 172 (1927). "The court must decide as a matter of law whether there is a recognized public or private interest which would justify the utterance of publication". *Schultz v. Newsweek*, 668 F.2d at 918.

■ One privileged occasion involves publications or broadcasts which are in the public interest. The privilege "rests upon considerations of public policy." *Lawrence v. Fox*, 357 Mich. at 137, 97 N.W.2d 719. The privilege "varies with the situation [and] with what is regarded as the importance of the social issues at stake." *Id.* at 138, 97 N.W.2d 719. The privilege applies as a matter of law where the plaintiffs' activities or opinions are in the public interest. *Schultz v. Newsweek*, 668 F.2d at 918; *Orr v. Argus Press*, 586 F.2d at 1108; *Fortney v. Stephan*, 237 Mich. 603, 213 N.W. 172; *Bostetter v. Kirsch Co.*, 319 Mich. 547, 30 N.W.2d 276 (1948).

■ Once a court determines that the occasion is privileged, the court must next determine whether the allegedly defamatory statement is within the scope of the qualified privilege. *Bowerman v. Detroit Free Press*, 287 Mich. 443, 447, 283 N.W. 642 (1939). The defendant in *Bowerman* published a newspaper article concerning a judicial proceeding. The article was inaccurate, and contained libelous language. Nevertheless, the defendant argued that there was a qualified privilege to report on judicial proceedings. The court first held that the "extrinsic circumstances in the instant case are that defendant's newspaper was reporting a judicial proceeding which created a qualified privilege." *Id.* at 447, 283 N.W. 642. The *Bowerman* court also held that the newspaper article was not within the scope of the qualified privilege. The court reasoned that the privilege did not justify inaccuracies in the published report.

In *Timmis v. Bennett*, 352 Mich. 355, 89 N.W.2d 748 (1958), the Michigan Supreme Court adopted the following statement from 33 Am.Jur., Libel and Slander, § 126:

> The essential elements of a conditionally privileged communication may accordingly be enumerated as good faith, an interest to be upheld, *a statement limited in scope to this purpose*, a proper occasion, and publication in a proper manner and to proper parties only.

*Id.* at 369, 89 N.W.2d 748 (Emphasis added.) The plaintiff in *Timmis*, a police officer, claimed that statements made concerning the performance of her official duties were defamatory. The court held that the statements were within the scope of the qualified privilege because of the public's interest in law enforcement matters and the actions of members of the police department.

Judge Lively's opinion in *Schultz v. Newsweek*, 668 F.2d 911, is also instructive. In *Schultz*, this Court held that the scope of Michigan's qualified privilege is not a question of fact. In a *Newsweek* article concerning the disappearance of Jimmy Hoffa, the plaintiff was referred to as a "Detroit underworld figure." Four articles which appeared in the *Detroit News* also discussed the plaintiff. Three of these articles con-

cerned the disappearance of Jimmy Hoffa. Schultz was referred to as a "longtime underworld figure" and one of the last two men that Jimmy Hoffa was to have met before his disappearance. The fourth article discussed the problems encountered by Schultz's sons in their attempt to obtain a liquor license. This article stated that Schultz was a key figure in the investigation of Jimmy Hoffa's disappearance.

Schultz brought a libel action in which he conceded that Hoffa's disappearance was a matter of public interest. Nevertheless, Schultz argued that because he was an incidental figure in these articles the scope of Michigan's qualified privilege was a jury question. The defendant publishers argued that the entire report contained in each article was privileged and that there was no issue of scope since Schultz was not a "peripheral" or "incidental" figure. The court rejected Schultz's argument that the scope of the privilege is a matter of fact. The court relied upon *Bowerman v. Detroit Free Press*, 287 Mich. 443, 283 N.W. 642, and held that the scope of the privilege is a question of law. We agree with the court's holding that the scope of the privilege is to be decided by the court as a question of law.

■ The qualified privilege does not extend, however, to plaintiffs who are not the focus of the alleged public interest publication. A plaintiff who is merely an incidental figure in the broadcast is not, as a matter of law, within the scope of the privilege. *See Timmis*, 352 Mich. at 369, 89 N.W.2d 748. The policy underlying Michigan's qualified privilege is to promote reporting and comment about matters which are in the public interest. *Lawrence v. Fox*, 357 Mich. 134, 97 N.W.2d 719. If an individual is involved in some activity or proffers an opinion which is in the public interest, then a news story concerning that individual's activity or opinions is also in the public interest.

The same considerations do not apply where the plaintiff has only the most tenuous connection with the public interest subject matter. A newspaper or television broadcast concerning this incidental plaintiff is not in the public interest. The societal interests which the privilege protects are not furthered by expanding the scope of the privilege to include such individuals. Consequently, the scope of Michigan's qualified privilege does not encompass publications or broadcasts where the plaintiff is not the focus of the public interest publication.

■ In this case, Act III focused on the devastating effects of street prostitution on a middle-class neighborhood. The activities or opinions of the street prostitutes would clearly be in the public interest. Moreover, the reactions of residents to the street prostitutes is also in the public interest.

Plaintiff's participation in the Broadcast, however, was not in the public interest. There was a nexus between the plaintiff in *Schultz v. Newsweek*, 668 F.2d 911, and the subject matter of the articles: the disappearance of Jimmy Hoffa. By contrast, Plaintiff's appearance in the Broadcast had absolutely no connection with the subject matter of the Broadcast, i.e., street prostitution and its effect on a Detroit neighborhood. It is undeniable that Plaintiff was at best an incidental figure in the discussion of street prostitution.[5] Plaintiff was not a prostitute when this segment of the Broadcast was filmed, nor was she one when the Broadcast was aired. In fact, as noted earlier, it is uncontroverted that Plaintiff has never engaged in prostitution or any sex-related business. Moreover, Plaintiff was not a resident of the Detroit neighborhood discussed during Act III. Instead, she resided in Ferndale, Michigan, when she was filmed and when the broadcast was aired. Although she was not a resident of this neighborhood, her reaction to the street prostitutes may have been in the public interest.

---

**5.** That plaintiff is merely an incidental figure in the Broadcast is also evident from ABC's pleadings in this case. First, in its Answer, ABC claimed as an affirmative defense that "[T]he portions of [t]he news report of which plaintiff complains were not of and concerning her." App. 8. Second, in its summary judgment motion, ABC claimed that "[t]he balance of the news documentary was not 'of and concerning' Plaintiff." App. 33.

However, she was not filmed during a protest march against the presence of street prostitutes, nor was she being harassed by the street prostitutes or the cruising customers. Also, she was not interviewed concerning her reactions to street prostitution. Therefore, her picture as she walked down a public street has absolutely no connection with the subject matter of the Broadcast.

We therefore conclude that Plaintiff's participation in the Broadcast was neither in the public interest nor within the scope of Michigan's qualified privilege as a matter of law.

## III. FIRST AMENDMENT PRINCIPLES

Even though Michigan's qualified privilege does not apply in this case, we must determine whether any constitutional principle requires Plaintiff to prove that ABC acted with actual malice as defined in *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686. For the reasons below, we hold that no constitutional principle requires that Plaintiff prove actual malice.

 The Broadcast raises the factual question of whether Plaintiff was depicted as a prostitute or could have reasonably been mistaken for a prostitute. An editorial opinion held by ABC, no matter how pernicious, would be entitled to First Amendment protection. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339, 94 S.Ct. 2997, 3006, 41 L.Ed.2d 789 (1974).

The First Amendment, however, does not afford ABC the same absolute protection for misstatements of fact. "[T]here is no constitutional value in false statements of fact." *Id.* at 340, 94 S.Ct. at 3007. Nevertheless, the Supreme Court has afforded publishers and broadcasters limited protection from liability in defamation actions. In *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, the Supreme Court held that publishers and broadcasters could not be liable in defamation actions brought by public officials unless the publisher or broadcaster acted with actual malice. It is clear that Plaintiff is not a public official.

The Court extended the *New York Times v. Sullivan* malice requirement to libel suits brought by public figures. *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). "[Public figures] may recover from injury to reputation only on clear and convincing proof that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth." *Gertz*, 418 U.S. at 342, 94 S.Ct. at 3008. *See Street v. National Broadcasting Co.*, 645 F.2d 1227, 1233 (6th Cir.), *cert. granted*, 454 U.S. 815, 102 S.Ct. 91, 70 L.Ed.2d 83, *cert. dismissed*, 454 U.S. 1095, 102 S.Ct. 667, 70 L.Ed.2d 636 (1981); *Walker v. Cahalan*, 542 F.2d 681, 684 (6th Cir. 1976), *cert. denied*, 430 U.S. 966, 97 S.Ct. 1647, 52 L.Ed.2d 357 (1977). The court in *Gertz* defined "public figures" for purposes of the First and Fourth Amendment as follows:

For the most part those who attain this status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment. *Gertz*, 418 U.S. at 345, 94 S.Ct. at 3009.

Plaintiff is not a public figure for all purposes. "Absent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society, an individual should not be deemed a public personality for all aspects of [her] life". *Id.* at 352, 94 S.Ct. at 3013. Plaintiff has no general fame or notoriety. *See Wolston v. Reader's Digest Association, Inc.*, 443 U.S. 157, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979). She also lacks any pervasive involvement in the affairs of society. *See Id.* at 164, 99 S.Ct. at 2705; *Time, Inc. v. Firestone*, 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976).

Plaintiff also cannot reasonably be regarded as a limited public figure. *Gertz* establishes a two-pronged analysis to determine if an individual is a limited public figure. First, a "public controversy" must exist. *Gertz*, 418 U.S. at 345, 94 S.Ct. at 3009. Second, the nature and extent of the individual's participation in the particular controversy must be ascertained. *Id.* at 352, 94 S.Ct. at 3013.

The Supreme Court has not clearly defined the elements of a public controversy. In *Time, Inc. v. Firestone*, however, the Supreme Court explicitly rejected the defendant publisher's argument that a "public controversy" should be equated with all controversies of interest to the public. The plaintiff in *Firestone* was the wife of a scion of a wealthy industrial family. She and her husband obtained a divorce, but the defendant inaccurately described the grounds for the divorce in an article. The Court held:

> Dissolution of a marriage through judicial proceedings is not the sort of "public controversy" referred to in *Gertz*, even though the marital difficulties of extremely wealthy individuals may be of interest to some portion of the reading public. *Firestone*, 424 U.S. at 454, 96 S.Ct. at 965.

In this case, the effects of sex-related businesses in general, and the particular effects of street prostitution on a middleclass Detroit neighborhood, may be the kind of "public controversies" referred to in *Gertz*. The public's interest in the effects of prostitution in a Detroit neighborhood are arguably greater than the divorce proceedings of a wealthy couple. *Cf. Firestone*, 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154.

■ Even though the subject matter of the Broadcast may be the type of "public controversy" recognized in *Gertz*, the nature and extent of Plaintiff's participation in this public controversy must still be examined. The nature and extent of an individual's participation is determined by considering three factors: first, the extent to which participation in the controversy is voluntary; second, the extent to which there is access to channels of effective communication in order to counteract false statements; and third, the prominence of the role played in the public controversy. *Gertz*, 418 U.S. at 344–345, 94 S.Ct. at 3009; *Wolston*, 443 U.S. at 165–168, 99 S.Ct. at 2706–2707; *Hutchison v. Proxmire*, 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979). *See Wilson v. Scripps-Howard Broadcasting Co.*, 642 F.2d 371 (6th Cir.), *cert. granted*, 454 U.S. 962, 102 S.Ct. 500, 70 L.Ed.2d 377, *cert. dismissed*, —— U.S. ——, 102 S.Ct. 984, 71 L.Ed.2d 119 (1981); *Street v. National Broadcasting Co.*, 645 F.2d at 1234. Applying these three factors to the instant case, we conclude that Plaintiff is not a limited public figure.

■ First, Plaintiff did not voluntarily participate in the public controversy surrounding the effects of street prostitution on a middleclass neighborhood in Detroit. In *Street v. National Broadcasting Co.*, 645 F.2d 1227, this Court held that the plaintiff, the prosecutrix and main witness in the Scottsboro rape trial, was a public figure when she appeared in a play concerning that trial. The plaintiff gave press interviews and aggressively proffered her extrajudicial version of the case. In *Orr v. Argus-Press*, this Court held that the plaintiff was a limited public figure because, *inter alia*, he voluntarily sought publicity.

The instant case is distinguishable from *Street* and *Orr*. Plaintiff never sought to obtain publicity for her actions or opinions. In fact, like the plaintiff in *Wolston*, "[Plaintiff] was dragged unwillingly into the controversy." *Wolston*, 443 U.S. at 166, 99 S.Ct. at 2707. Plaintiff was never a prostitute, nor was she engaged in any sex-related business. Moreover, she was not a resident of the Detroit middleclass neighborhood focused on during Act III. Finally, it appears that Plaintiff was unaware that she was being photographed. ABC never requested nor received permission to film Plaintiff or include her picture in the Broadcast.

Second, unlike the plaintiff in *Street*, Plaintiff has no access to channels of effective communication in order to counteract the false statements. Following the Broadcast, the press has not clamored to interview her. *Cf. Street*, 645 F.2d at 1234. Moreover, she does not have the "regular and continuing access to the media that is one of the accouterments of having become a public figure." *Hutchinson*, 443 U.S. at 136, 99 S.Ct. at 2688. Before Plaintiff's appearance in the Broadcast, she lived in relative obscurity. Her appearance during Act III did not change this fact. Therefore, she did not have any means to effectively contradict the erroneous impression that she was a prostitute.

Finally, as noted previously, Plaintiff played no prominent role in the subject matter which was the focus of Act III. In essence, Plaintiff was merely an incidental figure in the discussion of street prostitution. Therefore, the airing of Plaintiff's picture as she walked down the street was not relevant to any examination of the effects of street prostitution on a Detroit neighborhood.

The nature and extent of Plaintiff's involvement in the subject matter of Act III leads to the inescapable conclusion that she was not a limited public figure. The Supreme Court has refused to extend the actual malice requirement of *New York Times v. Sullivan* to plaintiffs who are neither public officials nor public figures. *Gertz*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789. Thus, Plaintiff is not required to prove on remand that ABC acted with actual malice.

## IV. CONCLUSION

We conclude that the Broadcast was capable of a defamatory meaning. Because the Broadcast was susceptible to two interpretations, one defamatory and the other non-defamatory, summary judgment for ABC was improvidently granted. Accordingly, we reverse and remand the case to the district court for proceedings consistent with this opinion.

---

\* Circuit Judge Brown retired from regular active service under the provisions of 28 U.S.C.

BAILEY BROWN,\* Senior Circuit Judge, dissenting.

I respectfully dissent. In the first place, after viewing the relevant parts of the documentary several times, I believe that, contrary to the majority opinion, the district court was correct in its determination that the portrayal of Mrs. Clark could not reasonably be construed as defamatory. In the second place, and in any event, I believe that American Broadcasting Companies, Inc. (ABC) enjoyed a qualified privilege under Michigan law.

## I.

Act III of ABC's documentary focused on the devastating impact of street prostitution on the neighborhoods bordering Detroit's Woodward Avenue "when sex businesses first proliferated on Woodward Avenue in the early 1970s" and the subsequent struggle that occurred "between the quiet, orderly, middle class people who live here, and some street prostitutes and pimps who tried to move in." App. 70. Act III featured interviews of Woodward Avenue area residents, who described their anguish in witnessing blatant public pandering. These residents described how men would be "accosted" by prostitutes as they walked in the neighborhood with their families, how "the pimps were matching the johns and the prostitutes," and how "[t]hose who lived in the neighborhood were subject to conduct they considered inconceivable. The rules they lived by no longer applied." App. 71. The focus of the dialogue then turned to the mortifying experiences suffered by neighborhood women who were mistaken for prostitutes:

MRS. CARR:

Whether you're 15 or 45, constantly being approached—it's degrading—feels terrible.

SUE CARR:

You want to, you know, just kill 'em ... cause it makes you so angry to be placed down to a hooker's level.

§ 371(b) on June 16, 1982, and became a Senior Circuit Judge.

HOWARD K. SMITH [Commentator]:

According to residents, and Detroit police records, most of the prostitute's customers or johns were white; the street prostitutes were often black.

This integrated middle class neighborhood became a safe meeting place for prostitutes and "johns."

But for black women whose homes were there, the cruising white customers were an especially humiliating experience.

SHERI MADISON [a black woman]:

Almost any woman who was black and on the street was considered to be a prostitute herself. And was treated like a prostitute.

PAM HILL:

How did that make you feel then?

SHERI MADISON:

Outraged . . . outraged.

Young girls in some cases, high school students were actually approached physically assaulted. Intolerable, absolutely intolerable situations.

App. 72–73.

During this dialogue, three women were photographed in rapid succession as they walked down a street, the last of which was the plaintiff, Mrs. Ruby Clark. The first two women appeared as the commentator, Howard K. Smith, commented: "This integrated middle class neighborhood became a safe meeting place for prostitutes and 'johns.'"

District Judge Julian Abele Cook, Jr., who granted summary judgment for ABC, described these two women:

The first woman was white, elderly with two bags; presumably shopping bags, one in each hand, walking along the street. It was a full length view. The second picture was of a [black] woman who appeared to be in her middle age with a package in her arm, coming out of what appeared to be a store.

App. 398. The appearance of Mrs. Clark came while the commentator next remarked: "But for black women whose homes were there, the cruising white cus-

tomer's were an especially humiliating experience." Mrs. Clark appeared on the screen for three to five seconds, and only her head and shoulders were shown. The district judge then described Mrs. Clark's appearance:

The third picture was that of Mrs. Clark, the plaintiff, who appeared to be walking on a public street without any visible evidence of anything within her hands and, by contrast to the earlier two women, had earrings and what I may describe, though it may not be accurate, as a reasonably fancy or stylish hair style.

App. 398. Judge Cook also noted that Mrs. Clark "appeared to be fairly well dressed, though not excessively." App. 399.

After Mrs. Clark's libel suit against ABC had progressed through extensive discovery, the parties filed cross-motions for summary judgment. Judge Cook, after viewing the documentary several times, concluded that "[t]here is nothing in [Mrs. Clark's] appearance which would suggest, I think, to the reasonable mind that her activity would, in any way, parallel that of the act of prostitution, as varied as those acts may be," and granted ABC's motion for summary judgment. App. 399–400.

I agree with the majority that the proper standard to be used by the district court for its threshold determination whether a defamation action under Michigan law should be dismissed on summary judgment is "whether the Broadcast [of Mrs. Clark walking down the street] was reasonably capable of a defamatory interpretation." *Ante* at 1213. This standard is more fully explained in *Michigan United Conservation Clubs v. CBS News*, 485 F.Supp. 893, 902 (W.D.Mich.1980), *aff'd*, 665 F.2d 110 (6th Cir. 1981) (applying Michigan law):

It is a well established rule that it is the duty of the court to determine if a communication is capable of bearing a defamatory meaning. *Washington Post Co. v. Chaloner*, 250 U.S. 290, 293, 39 S.Ct. 448, 63 L.Ed. 987 (1919); *Commercial Publishing Co. v. Smith*, [6 Cir.], 149 Fed. 704, 706–707 (1907); *Van Lonkhuyzen v. Daily News Co.*, 203 Mich. 570, 587–588, 170

N.W. 93 (1918); Restatement (Second) of Torts, § 614 (1977). In making this decision, the court must decide two questions: first, whether the communication is reasonably capable of conveying the particular meaning, or innuendo, ascribed to it by the plaintiff; and second, whether that meaning is defamatory in character. Restatement (Second) of Torts, § 614, comment b. If the publication is capable of more than one meaning, and one of these is defamatory, then it is for the jury to determine whether the communication was understood as being defamatory. *Washington Post Co. v. Chaloner, supra*; Restatement (Second) of Torts, § 614(b).

However, the majority, in asserting that "[w]hether the Broadcast was understood as being defamatory was for the jury to decide," *ante* at 1213, fails to adequately explain the respective roles of the district court and the jury. "*If* the publication is capable of more than one meaning," an initial determination made as a matter of law by the district court, "*then* it is for the jury to determine whether the communication was understood as being defamatory." *Id.*, 485 F.Supp. at 902 (emphasis added).

The sequence of events in *Michigan United Conservation Clubs* well illustrates the operation of these principles. One of the plaintiffs, Mr. Washington, contended that use of his voice from an unrelated interview during a segment of a CBS broadcast about hunting was defamatory. The district court concluded that no reasonable interpretation of the CBS broadcast would convey a defamatory meaning as to Mr. Washington, and therefore there was no issue to be taken to the jury. Our court, affirming the district court, determined:

> Finally, we agree with the District Court that use of an unattributed tape of Washington's voice as background for a scene of Colorado hunters handling deer carcasses, *was not defamatory as a matter of law* .... Under these circumstances, this segment of the film was

incapable of conveying or supporting the innuendo that Washington suggests.

665 F.2d 112 (emphasis added).

Mrs. Clark's deposition stated that friends, acquaintances and relatives who watched the program concluded that she was portrayed by it as a prostitute. The majority opinion appears to place some credence on their interpretation of the documentary. However, because the determination whether a publication is reasonably capable of a defamatory meaning is a preliminary *question of law* for the court, it is clear that the hearsay statements in Mrs. Clark's deposition concerning the interpretation of the broadcast by third parties were irrelevant to the district judge's deliberations.

I also disagree with the majority's assertion that Judge Cook "applied an incorrect standard" in granting summary judgment for ABC. The majority complains that Judge Cook "should have granted summary judgment for ABC only if the Broadcast was not reasonably capable of a defamatory meaning." *Ante* at 1213. However, the record clearly indicates that that was the standard used by Judge Cook, since he carefully scrutinized "the program to determine if Mrs. Clark, under any reasonable criterion, could be viewed as a prostitute or hooker within the context of the program," and concluded that it was not reasonably capable of being interpreted as portraying Mrs. Clark as a common street prostitute. App. at 400–01.

The majority opinion adopts an unrealistic standard by claiming that because "the court found it necessary to agonize over the question of whether the Broadcast was defamatory ... the case should have been submitted to the jury." *Ante* at 1214. If the majority intends to suggest that summary judgment is precluded anytime a district judge finds it necessary to give sensitive consideration to a plaintiff's allegations, that is a curious standard indeed to provide direction to the trial courts.

Furthermore, I disagree with the majority's conclusion that "[t]he Broadcast was reasonably capable of two meanings, one

defamatory and the other non-defamatory." *Ante* at 1214. In *Washington Post Co. v. Chaloner*, 250 U.S. 290, 39 S.Ct. 448, 63 L.Ed. 987 (1919), the Supreme Court explained the role of a judge in reviewing an allegedly defamatory publication: " 'A publication claimed to be defamatory must be read and construed in the sense in which the readers to whom it is addressed would ordinarily understand it.... When thus read, if its meaning is so unambiguous as to reasonably bear but one interpretation, it is for the judge to say whether that signification is defamatory or not.' " *Id.* at 293, 39 S.Ct. at 448, quoting *Commercial Pub. Co. v. Smith*, 149 F. 704, 706–07 (6th Cir. 1907). I believe that when examined in its proper context, Mrs. Clark's appearance on the ABC broadcast unambiguously portrayed her as a middle-class resident of the neighborhood affected by the invasion of the prostitutes, not as one of the prostitutes.

The majority opinion inaccurately contends that the particular segment of the broadcast in which Mrs. Clark appeared had its "focus on street prostitution." *Ante* at 1213. Therefore, because the audio portion of the broadcast had earlier noted that "[t]he street prostitutes were often black," the majority takes the unusual position that the appearance of Mrs. Clark, a "slim, attractive, stylishly dressed" black woman wearing large earrings and appearing to be in her early to mid-twenties suggested the possibility that she was a street prostitute.

On the contrary, the theme of this part of ABC's documentary was the invasion by sex-related businesses of this middle-class, integrated Detroit neighborhood and its impact on women in the area who were *not* street prostitutes. Throughout the broadcast, whenever a prostitute was shown, ABC took great pains to convey the message that a prostitute was being portrayed. Such things as suggestive clothing, suggestive walking, or overt acts of solicitation, which the district court correctly determined were not present in the case of Mrs.

Clark's appearance, were utilized to pinpoint the portrayal of streetwalkers in the earlier segment of the documentary. But the particular segment focusing on the anguish suffered by Woodward Avenue area residents from the influx of prostitution showed no obvious prostitutes. Instead, the women who appeared during this segment of the program were either being interviewed about the problems facing the neighborhood or were shown, as was Mrs. Clark and the other two women, walking in broad daylight on the street. The other two women, who appeared just prior to Mrs. Clark, admittedly were not portrayed by the broadcast as prostitutes. However, the majority opines that the striking contrast between Mrs. Clark and the other two women, whom the majority opinion characterizes as "matrons," makes it unclear "whether [Mrs. Clark] is a resident of this middle class neighborhood or one of the street prostitutes who plagued this community." *Ante* at 1213.

Plaintiff, for obvious reasons, is not contending that her appearance alone, in isolation from the broadcast, could reasonably be construed as giving viewers the impression she is a prostitute.[1] Indeed, after viewing the film, I am in total agreement with Judge Cook that there is nothing about Mrs. Clark's appearance that would convey to the reasonable mind the impression that she was a common street prostitute. It is obvious from viewing the film that Mrs. Clark was one of the "quiet, orderly, middle class people" who lived in the neighborhood, not one of the "street prostitutes" trying to move in. Nor is it contended that Mrs. Clark's race reasonably led to the innuendo that she was a prostitute, because although the commentator had remarked that the "street prostitutes were often black," he had also noted the dilemmas faced by non-prostitute black women in the neighborhood facing harassment from the "cruising white customers." The woman immediately preceding Mrs. Clark's appearance was also black; however, all are

---

1. Indeed, it would be anomalous to hold ABC liable for the impression of its viewers that Mrs. Clark was a prostitute if that interpretation were directly attributable to the way that she appeared while being photographed.

in agreement that she was not portrayed as a prostitute.

The majority concludes that the erroneous impression that Mrs. Clark was a prostitute arises when her appearance was juxtaposed with the appearance of the two "matrons." However, Mrs. Clark's appearance was entirely consistent with a middle class background, and her age in comparison with the two women preceding her appearance was not a reasonable distinguishing basis for concluding she was a prostitute while the other two women were middle class residents of the neighborhood.

The majority contends that the defamatory impression that Mrs. Clark was a prostitute was amplified by the audio comments of the documentary at the time of Mrs. Clark's brief appearance on the screen and the comments immediately following her appearance by Sheri Madison, a black female resident of the neighborhood who was interviewed concerning the "invasion." Those comments were as follows:

But for the black women whose home were there, the cruising white customers were an especially humiliating experience. [Sheri Madison's remarks:] Almost any woman who was black and on the street was considered to be a prostitute herself and was treated like a prostitute.

Prior to this point in the documentary, the focus had switched from the street prostitutes themselves to the incidental effects of the street prostitution invasion. Mrs. Clark's appearance can only be reasonably capable of the interpretation that she was a member of that group of middle class black women in the neighborhood who were subject to being accosted by "johns" looking for prostitutes among the women in the neighborhood. It is unrealistic to conclude that, because ABC indicated that Mrs. Clark's presence on the street could subject her to the humiliating experience of being mistaken for a prostitute, viewers of the program could also reasonably mistake Mrs. Clark's portrayal as being that of a common street prostitute.

## II.

Although I would affirm the district court solely on the basis that the ABC broadcast was not reasonably capable of a defamatory interpretation, I am constrained to comment on the majority's statements concerning the application of Michigan law with respect to qualified privilege. If the Michigan qualified privilege, which assumes that the broadcast was defamatory, applies to the documentary, there would be no liability for the broadcast because there was no showing that ABC knowingly or recklessly defamed Mrs. Clark. Indeed, there has been no contention that ABC ever intended for Mrs. Clark's appearance to be given the interpretation that she is a prostitute.

The majority has correctly noted that the applicability of the Michigan qualified privilege to publish allegedly defamatory statements is a question of law for the courts to determine, as is the proper scope of the qualified privilege. However, the majority opinion takes the stance that ABC did not properly limit the scope of its documentary to the purpose of communicating the concerns of Woodward Avenue area residents about the distressing invasion of street prostitution when it included Mrs. Clark in the broadcast. Consequently, the majority concludes that the Michigan qualified privilege does not apply because "the scope of Michigan's qualified privilege does not encompass publications or broadcasts where the plaintiff is not the focus of the public interest publication." *Ante* at 1216. However, Michigan law does not countenance such a narrow view of the qualified privilege. A fair reading of Michigan law indicates that the appearance of an individual in a public interest documentary is within the scope of a qualified privilege attaching to that documentary as long as the individual has a reasonable connection with the subject matter of the documentary. The ABC documentary illustrated the impact on the women in an entire neighborhood from the invasion of the sex-related businesses. Because Mrs. Clark was part of this broad category of neighborhood women who were subject to the humiliation of misidentification as a prostitute, her appearance was within the scope of the qualified privilege.

In *Timmis v. Bennett*, 352 Mich. 355, 89 N.W.2d 748 (1958), the plaintiff, a policewoman, alleged that she had been defamed by an attorney's letter inquiring about plaintiff's efforts to have the attorney's client declared mentally incompetent. The Michigan Supreme Court determined that a communication is privileged if made by a party having "a moral or social duty" to make the communication and directed to a "person having a corresponding interest or duty." The Court then held:

The essential elements of a conditionally privileged communication may according-

ly be enumerated as good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion, and publication in a proper manner and to proper parties only. The privilege arises from the necessity of full and unrestricted communication concerning a matter in which the parties have an interest or duty, and is not restricted within any narrow limits.

89 N.W.2d at 755. In addressing the scope of the privilege, the Court first determined that the purpose of the letter was to inquire about the activities of Kalamazoo law enforcement officials. Since the Court assumed that the public welfare embraced concerns about law enforcement, it determined that "the doctrine of qualified privilege may properly be regarded as including statements made in good faith by a citizen of a community having, or claiming to have, special knowledge or information bearing on such matter of public concern and communicated to others concerned or interested." *Id. See also, Nuyen v. Slater,* 372 Mich. 654, 127 N.W.2d 369 (1964); *and Bufalino v. Maxon Brothers, Inc.,* 368 Mich. 140, 117 N.W.2d 150 (1962).

It is not disputed that ABC has an "interest" or "duty" to communicate to its viewers the concerns about the effects of street prostitution on the residents of surrounding residential areas in Detroit, nor is it disputed that ABC's viewers have a corresponding "interest" in receiving that information. *Orr v. Argus-Press Co.,* 586 F.2d 1108, 1113 (6th Cir. 1978), *cert. denied,* 440 U.S. 960, 99 S.Ct. 1502, 59 L.Ed.2d 773 (1979) (applying Michigan law) ("Everyone, citizen or reporter, has the right to comment on matters of public importance . . . ."). There is no contention that ABC broadcast its documentary in bad faith, or that its publication of the broadcast was in any way improper.

The case of *Lawrence v. Fox,* 357 Mich. 134, 97 N.W.2d 719 (1959), is also highly instructive. *Lawrence* indicates that the threat of libel, which could "chill" the vigilance of the press, led to Michigan's adoption of the defense of privilege for certain publications. However, the privilege is not a constant, but operates on a continuum from "no privilege" for loose gossip to "absolute privilege" for judicial and legislative utterances. Public policy considerations "of lesser intensity" than those for absolute privilege would cause a limited, qualified privilege to be applied. 97 N.W.2d at 721. *Lawrence,* citing *Bowerman v. Detroit Free Press,* 287 Mich. 443, 283 N.W. 642 (1939), determined that the external circumstances or occasion of the communication, not the actual words used, would determine the scope of the privilege. The Michigan Supreme Court concluded: "[I]t is for the court to determine whether or not the external circumstances surrounding the publication are such as to give rise to a privileged occasion." 97 N.W.2d at 722.

This court in *Schultz v. Newsweek, Inc.,* 668 F.2d 911 (6th Cir. 1982) (applying Michigan law) concluded:

The court must decide as a matter of law whether there is a recognized public or private interest which would justify the utterance or publication. The privilege attaches to reports on matters of general public interest even though the plaintiff is a private individual.

*Id.* at 918. Similarly, the district court opinion that was affirmed in *Schultz v. Newsweek, Inc.,* reported at 481 F.Supp. 881 (E.D.Mich.1979) and authored by now Circuit Judge Kennedy, stated that "[u]nder Michigan law, there is a qualified privilege to publish information which is in the public interest," *id.* at 884, and implied that the entire article comprising the communication is within the scope of the privilege as long as the communication does not stray into discussing areas of concern not within the reasonable limits of the public interest.

In *Schultz v. Reader's Digest Ass'n,* 468 F.Supp. 551 (E.D.Mich.1979) (Freeman, J.) (applying Michigan law),[2] plaintiff argued that the qualified privilege did not apply because he was an incidental figure in news stories concerning the disappearance of Jimmy Hoffa. Again, the court indicated that the "scope" of the qualified privilege is

**2.** There are two cases from the United States District Court for the Eastern District of Michigan involving Leonard Schultz. The Newsweek litigation, *Schultz v. Newsweek, Inc.,* 481 F.Supp. 881 (E.D.Mich.1979) (Kennedy, J.), *aff'd,* 668 F.2d 911 (6th Cir. 1982), addressed news articles about Schultz's involvement in attempts by his sons to obtain a state liquor license as well as Schultz's alleged connection with the disappearance of Jimmy Hoffa. The Reader's Digest case, *Schultz v. Reader's Digest Ass'n,* 468 F.Supp. 551 (E.D.Mich.1979) (Freeman, J.) was concerned only with a publication about the Hoffa controversy.

determined by the subject matter of the communication, in this case "the question of who Hoffa was to meet on the day he disappeared," and not necessarily the persons discussed in the articles themselves:

> [T]he Court is of the opinion that an article involving a matter of public concern is subject to a qualified privilege under Michigan law. Although there can be no dispute that the article in question involved a matter of public concern, the plaintiff contends that the qualified privilege should not be applied to him because he was not a central figure in the Hoffa disappearance. Whatever role Schultz played in this matter, it is clear to the Court that the question of who Hoffa was to meet on the day he disappeared was and is an important matter of public concern.

*Id.* at 562.

The majority opinion seems to concede that the impact of street prostitution on surrounding residential neighborhoods is in the public interest.[3] Therefore, the majority apparently would concur that the examination of this dilemma by ABC's documentary was in the public interest and subject to a qualified privilege as a general proposition. However, the majority opinion contends that Mrs. Clark's particular appearance on the program is not within the public interest focus of the documentary because "plaintiff has only the most tenuous connection with the public interest subject matter." *Ante* at 1216. The majority concludes that "plaintiff is not the focus of the public interest publication" because plaintiff has never been a prostitute, she was not a resident of the neighborhood being invaded by the sex-related businesses and she was not interviewed about her reactions to the street prostitution; accordingly, "her picture as she walked down a public street has absolutely no connection with the subject matter of the Broadcast." *Ante* at 1217.

However, as previously noted, Michigan case law focuses on the general subject matter of a communication in determining if the qualified privilege applies. In this connection, it is undeniable that the subject matter of this portion of the ABC documentary was the impact of the invasion of sex-related businesses on the female residents of this integrated middle class Detroit neighborhood who were forced to run the risk of being mistaken for prostitutes and possible solicitation by using the public sidewalks in their neighborhoods. It defies reality to contend that Mrs. Clark's appearance in the neighborhood of the sex businesses on Woodward Avenue, which would potentially subject her to the same abuse and harassment that the documentary was addressing, was so unrelated to the subject matter of the broadcast as to make her an "incidental figure" with "no connection" with the broadcast. *See ante* at 1216.

The majority has made the unsupported contention that, since Mrs. Clark was a resident of Ferndale, Michigan, she was not a resident of the neighborhoods blighted by the invasion of the sex businesses, and consequently the abuse suffered by women in those neighborhoods was not a problem peculiar to her. However, the majority opinion neglects to note that Woodward Avenue intersects Ferndale, Michigan, which is a suburb bordering the city of Detroit. The record adequately demonstrates that, although Mrs. Clark claims she did not frequent the immediate vicinity of the sex businesses, their location was not far from her home.

Mrs. Clark's appearance in the ABC documentary should be subject to the Michigan qualified privilege because the subject matter of the documentary was in the public interest and her appearance bore a reasonable relationship to that general subject matter.

## CONCLUSION

In conclusion, I am persuaded that Judge Cook did not err in determining that Mrs. Clark's appearance in the broadcast could not reasonably be construed as portraying her as a common street prostitute. I also conclude that in any event, even assuming that Mrs. Clark's appearance could be interpreted as defamatory, Michigan's qualified privilege should be applied to this portion of the documentary, which did not exceed the bounds of the public interest subject matter of the documentary. While under current precedents it appears that the First Amendment is not implicated, it appears to me that the majority's disposition of this case will make the filming of television docu-

---

3. Judge Cook, although he did not reach the qualified privilege issue in granting summary judgment, did conclude "that the broadcast was of public interest." App. 396.

mentaries unduly risky and therefore the majority's disposition is not in the public interest.

## ORDER

On September 21, 1982 by order of the Chief Judge of the Circuit you were advised that the motion for rehearing en banc in the above-styled case had been granted. The Chief Judge has now directed me to advise that his ruling was made in error and that in fact the 5–4 vote (one active judge being disqualified) failed to attain the 6 affirmative votes required to constitute "a majority of the [10] circuit judges who [were] in regular active service" within the meaning of Rule 35(a) of the Federal Rules of Appellate Procedure. See also *Zahn v. International,* 469 F.2d 1033 (2d Cir. 1972), *aff'd. on the merits,* 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973); *Boraas v. Village of Bell Terre,* 476 F.2d 806 (2d Cir. 1973), *rev'd on the merits,* 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974) (rehearing en banc denied though four judges of the eight member court favored it); *International Business Machine Corp. v. United States,* 480 F.2d 293 (2d Cir. 1973); *Boyd v. Lefrak Organization,* 517 F.2d 918 (2d Cir. 1975); *United States v. Martorano,* 620 F.2d 912 (1st Cir.), *cert. denied,* 449 U.S. 952, 101 S.Ct. 356, 66 L.Ed.2d 216 (1980).

The briefing schedule is therefore cancelled and the motion for rehearing is referred to the panel which originally heard the appeal.

## ORDER DENYING PETITION FOR REHEARING

A majority of the judges of the Court having not favored rehearing en banc, the petition for rehearing has been referred to the hearing panel for disposition.

Judge Brown would grant the petition to rehear for the reasons set out in his dissent to the majority opinion.

Upon consideration, the Court concludes that the petition for rehearing is without merit. Accordingly, it is ORDERED that rehearing be and hereby is denied.