Harlan E. ORR, Plaintiff-Appellee,

v.

The ARGUS–PRESS COMPANY,
Defendant-Appellant.

No. 76–2206.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 14, 1978.

Decided Oct. 19, 1978.

DesJardins & DesJardins, Jerry L. Des-Jardins, Owosso, Mich., for defendant-appellant.

James J. Kobza, Muskegon, Mich., for plaintiff-appellee.

Before PHILLIPS, Chief Judge, and CELEBREZZE and MERRITT, Circuit Judges.

MERRITT, Circuit Judge.

In this diversity case, following a jury trial in the United States District Court for the Eastern District of Michigan, appellant, the Argus-Press Company, was found liable for .$5,000 compensatory damages and $15,000 punitive damages for publishing an allegedly libelous article regarding the indictment and arrest of Harlan Orr, appellee, on charges of securities fraud. We conclude that "actual malice" is the standard to be applied in the present case, both under the "qualified privilege" developed at common law in the courts of Michigan and under the first amendment, as interpreted by the Supreme Court in *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and later cases. While the malice standards are somewhat different under Michigan law and under the first amendment, both of those standards protect the newspaper from liability in the context of this case. We therefore vacate the judgment below and remand the case to the District Court to dismiss plaintiff's suit with prejudice.

## I. STATEMENT OF THE CASE

### A. Conduct of the Parties

Orr, a Wisconsin attorney and president of the J.M.H. Development Company, proposed to build a shopping mall in Owosso, Michigan. The venture was publicized in the local press, in part as a result of efforts by Orr and his associates to obtain publicity. To raise money, Orr prepared and distributed to local investors a prospectus describing the project. Orr was attempting to raise $250,000 through stock sales but, in fact, received only $27,500 from five local investors. The project fell through, and the investments were returned.

In November, 1973, Orr and a business associate were indicted in connection with the venture on a total of thirty-four charges of violations of the Michigan securities laws. Orr himself was charged with fifteen counts. Five counts charged the unlawful sale of unregistered stock; eight counts charged the unlawful failure to disclose information; two counts charged affirmative acts of deceit, alleging that Orr had told two potential investors that J. C. Penney Company, a large department store, had already leased space in the proposed mall when, in fact, the company had not done so.

After Orr's indictment and arrest, the Argus-Press published the following story. We italicize the words which Orr contends are libelous:

"Two Charged in Shopping Mall *Fraud*":

A former Owosso man and his business partner have been charged with a total of *34 counts of fraud* in connection with a *phony shopping* mall investment *scheme that allegedly sought to take* $250,000 from local investors according to Shiawassee County Sheriff's Dep. Herb Runyan.

Merlin Goodrich, 39, now of rural Muskegon, and Harlan E. Orr, 71, president of the J.M.H. Development Corp., Muskegon, were taken into custody on the charges by Muskegon County Sheriff's deputies Monday and transferred to the Shiawassee County Jail later in the day. Goodrich is *charged with 19 counts of fraud, Orr, with 15.*

Following arraignment this morning a preliminary examination for Goodrich was scheduled in District Court for Jan. 8 and his bond was set at $2,000. A December preliminary examination was scheduled for Orr, whose bond was set at $5,000.

Charges against the two men stem from a proposed Chippewa Mall investment project, to be developed by J.M.H. Development, which the men claimed was to have been built on five parcels of land along E. M. 21, between Herb's Auto Parts and the Owosso Auto Auction, Runyan said.

Goodrich, who listed his occupation as pastor of a Muskegon church, and Orr reportedly approached area persons last April seeking twenty-five $10,000 investment subscriptions for the proposed 30-store, $250,000 mall. Runyan said the men had obtained five local subscriptions totaling $27,500, but that the monies had been returned to the investors Sept. 21 after a joint investigation of the project was under way by the securities division of the Michigan Department of Commerce, the county sheriff's department and Owosso post state police.

Returning the money did not stop prosecution, Runyan explained, because *the fraud charges* are for the alleged sale of unregistered securities and for the alleged misrepresentation of securities offered for sale. The two men reportedly claimed the J. C. Penney Company had agreed to build an anchor store in the mall. Penney Company officials denied the claim, Runyan said.

Investigation of the project began when a local person involved in the investment transactions turned over evidence to detectives at the county sheriff's department, Runyan said. He added that at least 10 other persons and representatives of Newell Real Estate, 440 Corunna Ave., and Walker Realty, 211 E. Williams St., the two real estate firms which were handling the land for the project, had given statements implicating Goodrich and Orr in the *alleged swindle.*

Each charge of *fraud* against Goodrich and Orr carries a maximum sentence of three years in prison or a $5,000 fine, or both. [Emphasis added.]

Orr concedes that the basic factual statements contained in the story are true, but he objects to the characterization of his dealings as an "alleged swindle" and as "a phony shopping mall investment scheme that sought to take $250,000 from local investors." He also challenges the newspaper's description of the indictment as charging "fraud."

## B. The Jury Instructions of the District Court

The District Court charged the jury that it should apply Michigan's common law privilege of fair comment, as follows:

Under the Common Law rule of privilege, [there] is a qualified privilege for publications which are made in good faith on a matter of public concern and interest. The alleged libelous article published by the defendant in the Argus Press is entitled to this privilege if the article was published in good faith and without malice, for the criminal charges against plaintiff . . . was a matter of public concern and interest. . . . [An article is not published in good faith] if it is published either with knowledge of its falsity or with reckless disregard as to whether it is false or not. In order for a newspaper to have been reckless with regard to whether the article was false, the newspaper must have a higher degree of culpability than mere negligence or a failure to exercise reasonable care. Recklessness requires the defendants to have a high degree of awareness of the probable falsity of the article published.

The language of this charge combines the language of Michigan's common law privilege with the language of the first amendment privilege, as announced by the Supreme Court in a series of cases beginning with *New York Times v. Sullivan, supra.*

The District Court left to the jury the question of whether the state's accusations against Orr amounted to fraud. The charge strongly suggests that the Court believed that the newspaper unfairly described the charges as "fraud":

You must determine whether the alleged libelous article, when taken in its entirety and plain and natural meaning, expresses a fair and true report of the charges filed against the plaintiff and whether any inaccuracies would have changed the effect on the reader . . . . The article in question refers to these charges as being fifteen counts of "fraud."

The term "fraud" has various meanings under the law. The general meaning of fraud is to induce another person to part with a valuable thing by means of deception as by the intentional concealment of the truth.

The Michigan securities law [de]fines: "Fraud" more broadly and does not require any intent to deceive. For purposes of this act, fraud includes anything less than full disclosure of a matter where lack of full disclosure could be misleading to a purchaser of securities. *Thus, the charges against plaintiff of misrepresentation cannot be considered as charges of fraud within the meaning of that Act. Since the term "fraud" has various meanings, the use of the term would be accurate but not fair.* [Emphasis added.]

The jury apparently found that the words "fraud" and "swindle" were not justified by the facts and that the newspaper acted with "malice" in publishing the article. We hold that on the specific facts of this case a jury could not reasonably find that the newspaper's characterizations of the proceedings were sufficiently inaccurate to permit a concomitant finding that the newspaper published the article with "malice."

## II. COMMON LAW LIBEL UNDER MICHIGAN LAW

Few areas of the law are as analytically difficult as that of libel and slander where courts attempt to mesh modern, first amendment principles with common law precedents. For the sake of clarity, we will discuss first the state law issues, then the

constitutional problems presented by this case; but as a legal and practical matter, the two approaches are bound together.[1]

Initially, we consider the issues presented in this case under Michigan law: Is the article substantially true? If not, has the plaintiff proven that the newspaper published the story in bad faith?

## A. The Defense of Truth

█ First, as the District Court instructed the jury, the article is not libelous if substantially true. "To be true," the Court correctly stated, "it is not essential that the literal truth be established in every detail as long as the article contains the gist of the truth as ordinarily understood." We believe that most, if not all, of the reporter's story on Orr is substantially truthful and therefore not actionable.

Neither Orr's complaint nor the opinion of the District Court identified any specific, factual errors in the article. The story correctly reports that Orr was arrested and charged in a fifteen count indictment with various violations of the Michigan securities laws including making false statements to local investors that the J. C. Penney Company had agreed to lease a store in the proposed shopping center. It is also not disputed that the newspaper accurately reported the circumstances surrounding the shopping mall plan, including the amount of money Orr was trying to raise, the fact that the money was later returned, and the statements attributed to Deputy Runyan concerning the investigation.

The basis for Orr's complaint is the newspaper's characterization of Orr's activities as a "fraud," an "alleged swindle," and as "a phony shopping mall investment scheme that allegedly sought to take $250,000 from local investors." These expressions cannot easily be labeled as "facts" or as "opinion." At least in regard to the use of the words "fraud" and "swindle," however, we believe that the use of those words as statements of fact was substantially accurate.

Contrary to the District Court's instructions to the jury suggesting that the word "fraud" is unfair in the context of this case, we believe it is both accurate and appropriate to describe a violation of Michigan's securities laws. The language of the state statute under which Orr was charged simply repeats the language of SEC Rule 10b–5, 17 C.F.R. § 240.10b–5 (1977), adopted under the 1934 Securities Exchange Act, 15 U.S.C. § 78j(b) (1976), which prohibits various forms of securities fraud. Both the Michigan courts, *People v. Dempster,* 51 Mich.App. 612, 615, 216 N.W.2d 81, 82 (1974), and the courts of the United States, *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833 (2d Cir. 1968), have generally described the charges under these laws as involving securities "fraud."

While the word "swindle" may imply more serious wrongdoing than was involved here, the word is frequently used in colloquial speech as a substitute for "defraud." During the course of oral argument, in fact, Orr's attorney conceded, as he was bound to do, that if someone is accused of taking money from people by lying to them, the word "swindle" is a fair characterization of his actions. Although the word also connotes bad motive and an intent to defraud, the story as a whole sets forth sufficient facts concerning the circumstances of Orr's indictment and arrest for the reader to draw his own conclusion as to Orr's motives.

Much the same argument can be made that the characterization of Orr's actions as a "phony" scheme that sought to "take" $250,000 from local investors is the "gist of the truth." Certainly, Orr did "take" money from several local investors in attempting to raise a total of $250,000. The state did not charge in precise language that the whole plan was "phony." At least one part of it, the fictitious J. C. Penney lease, was

---

1. For a clear picture of the landscape in this changing area of the law, as well as a good description of the influences which are changing it, see Dean John Wade's lecture entitled "The Communicative Torts and the First Amendment," printed in 48 Miss.L.J. 671 (1977).

plainly "phony" according to the indictment, and in view of the inferences in the indictment that Orr's development company was underfinanced, the word "phony" is not an unreasonable characterization of the whole enterprise.

At the same time, it is also true that the words "take" and "phony," like "swindle," were ill chosen and might well convey to many readers the impression that Orr was merely a flimflam artist planning to "take the money and run." The facts set out in the rest of the story, however, do not justify those inferences about the plaintiff. Thus, while we think the District Court might well have directed a verdict at the close of the case on the ground that the evidence was insufficient to establish the article as a whole was an untrue description of the indictment, we do not rest our decision on that basis.

### B. The Fair Comment Privilege

■ The newspaper's second principal defense under Michigan law is that the plaintiff must prove that the newspaper published the article in "bad faith" or with "ill will." As a story about a matter of public concern, the article is protected under state law by the qualified privilege of "fair comment." *Lawrence v. Fox,* 357 Mich. 134, 97 N.W.2d 719 (1959); *Miner v. Detroit Post and Tribune Co.,* 49 Mich. 358, 363–65, 13 N.W. 773 (1882) (Cooley, J.). *See* Restatement of Torts, §§ 606, 607 at 275–85 (1938). *Accord, Nuyen v. Slater,* 372 Mich. 654, 127 N.W.2d 369 (1964); *Bufalino v. Maxon Brothers, Inc.,* 368 Mich. 140, 153, · 117 N.W.2d 150, 156 (1962). Everyone, citizen or reporter, has the right to comment on matters of public importance, and expressions of opinion and even misstatements of fact are not actionable in a libel suit unless made maliciously for the purpose of damaging another's reputation.

■ Negligence on the part of the newspaper is not sufficient to establish liability. Scienter is required. If the statement "be 'honestly believed to be true, and published in good faith,'" there is no scienter and no liability. *Lawrence v. Fox, su-*

*pra,* 357 Mich. at 142, 97 N.W.2d at 723, *quoting Powers v. Vaughan,* 312 Mich. 297, 305, 20 N.W.2d 196, 199 (1945), and *McAllister v. Detroit Free Press,* 76 Mich. 338, 43 N.W. 431 (1889). As long as the defamatory opinion is honestly held or the misstatement of fact is believed in good faith to be true, the statements are protected by the privilege.

■ As previously set forth, the charge to the jury accurately stated the Michigan privilege of fair comment and the applicability of that standard is not questioned by either party before us.

The District Court's opinion relied principally upon the following evidence as demonstrating the newspaper's bad faith:

The newspaper's witnesses admitted that the article as published did not follow the Associated Press print-out. The article was prepared in haste with the acting editor directing the reporter to change the story so that it did not merely repeat the story provided by the Associated Press. This the reporter did, and although the reporter testified that the change was based on his notes from interviews with Deputy Runyan, these notes were not produced but were claimed to have been lost.

This "evidence" does not warrant a finding of bad faith. That the newspaper ordered the reporter to rewrite an Associated Press account of Orr's indictment hardly demonstrates bad faith; it is standard practice. By rewriting the wire service story and adding additional information, the newspaper may then run the article under the by-line of one of its own reporters rather than as an Associated Press story.

Under any interpretation of the evidence, to allow this jury verdict to stand would turn the "malice" standard, the bad faith requirement, into a bare fiction. There is no evidence at all in the record to support a reasonable inference that the reporter or the editor for the newspaper did not believe that the state had charged Orr with fifteen counts of securities "fraud" involving a scheme to obtain or "take" money from investors by misrepresentation.

The District Court's error in its instructions in discussing the word "fraud" may explain why the jury went astray in this case, or the case may be a good example of the validity of Dean Prosser's criticism, apparently shared by Dean Wade, that the "malice" standard may be so subjective and confusing to a jury as to be meaningless and vanish into a standard of strict liability. W. Prosser, Law of Torts, § 115 at 795, § 118 at 821 (4th ed. 1971); *Wade, supra* n. 1, at 686. The jury must have concluded, based on the court's instructions, that the use of the word "fraud" to describe the charges against Orr was incorrect or unfair. Despite the court's instructions on malice, the jury must have then viewed the defendant as strictly liable for its error.

Whether this is an accurate analysis of the jury's deliberations is beyond our competence, but there is no evidence in this record that the newspaper thought its story was false or investigated and wrote the story with the kind of reckless "I-don't-care-about-the-truth" state of mind that would meet the requirement of scienter under the subjective malice standard. This case suggests that courts must be cautious about letting libel cases go to the jury under the malice standard where there is no proof that the reporter or his newspaper knew or suspected that the statements in his article were false. *See Nuyen v. Slater, supra,* 372 Mich. at 660, 127 N.W.2d at 373; *Raymond v. Croll,* 233 Mich. 268, 275–76, 206 N.W. 556, 558 (1925) ("If the circumstances relied on as showing malice are as consistent with its nonexistence as with its existence, the plaintiff has not overcome the presumption of good faith and there is nothing for the jury.")

## III. FIRST AMENDMENT PRINCIPLES GOVERNING LIBEL

Many of the state law issues we have just discussed have been subsumed in and altered by constitutional holdings. Our opinion today therefore rests both on state law and the first amendment. The constitutional issues presented are: Whether the defamatory words are protected as statements of opinion? If not, and if we consider the words as statements of fact, was Orr a "public figure" for purposes of the first amendment? If so, did the newspaper act with a reckless disregard for the truth of the statement?

## A. Statements of Opinion Protected under First Amendment

■ It is now established as a matter of constitutional law that a statement of opinion about matters which are publicly known is not defamatory. As the Supreme Court said in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339–40, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789, 805 (1974): "Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact."

■ Based on *Gertz* and other Supreme Court opinions, the American Law Institute, in its recent revision of the chapters on libel in the Restatement of Torts, adopted the following statement of the *Gertz* principle:

> A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion.
> Comment:
>    c.  .   .
>    It is the function of the court to determine whether the expression of opinion is capable of bearing a defamatory meaning because it may reasonably be understood to imply the assertion of undisclosed facts that justify the expressed opinion about the plaintiff or his conduct.   .   .   .

Restatement (Second) of Torts § 566 (1977).

The ALI illustrates this principle by hypothesizing two cases, one where the defendant writes that the plaintiff "sits around in his back yard with a drink in his hand and therefore must be an alcoholic,"

and the other where the defendant, without revealing any factual basis, simply says that the plaintiff "is an alcoholic." The first is an expression of opinion based on revealed facts and is, therefore, not actionable, while the second is an expression of opinion based on undisclosed facts. The ALI explains the distinction as follows:

> A simple expression of opinion based on disclosed or assumed non-defamatory facts is not itself sufficient for an action of defamation, no matter how unjustified and unreasonable the opinion may be or how derogatory it is. But an expression of opinion that is not based on disclosed or assumed facts and therefore implies that there are undisclosed facts on which the opinion is based, is treated differently. The difference lies in the effect upon the recipient of the communication.

*Id.*

Two other illustrations by the authors of the Restatement are relevant to the instant case:

> 1. A real estate developer, was attempting to persuade the city council to grant a zoning variance on certain land which he owned. The city desired to purchase another tract of land owned by him for a school site. In negotiations about the purchase price, A indicated that his agreeing to the city's offer might depend on his getting the variance. At a council meeting this position was described by a council member as blackmail. B, a newspaper, carries a full and accurate account of the council meeting, including a statement of A's negotiating position. It quotes the "blackmail" statement and itself uses that term and the term "skullduggery." The statement cannot be construed as charging that A committed the crime of blackmail and B is not liable for defamation. [The facts and holding of this hypothetical are taken directly from *Greenbelt Cooperative Publishing Ass'n v. Bresler,* 398 U.S. 6 [90 S.Ct. 1537, 26 L.Ed.2d 6] (1970).]
>
> 2. A, an employee, refused to become a member of the union recognized as the collective bargaining agent. The union

publishes statements calling A a scab. In one statement to this effect it publishes a well-known definition of a scab, characterizing him, among other things, as a "traitor to his God, his country, his family and his class." The language cannot be construed as a charge that A was guilty of treason and B is not liable for defamation. [This case is taken from the Supreme Court opinion in *Letter Carriers v. Austin,* 418 U.S. 264 [94 S.Ct. 2770, 41 L.Ed.2d 745] (1974).]

*Id.*

If we substitute the words "swindle," "fraud," or "phony scheme" for "skullduggery" or "traitor," we see that, to the extent the allegedly libelous words constitute opinion, as opposed to facts, the words are not defamatory.

In the instant case, as we have discussed, it is not disputed that the reporter accurately reported the underlying facts concerning Orr's indictment and arrest and that the only basis for Orr's complaint is that the reporter characterized the shopping mall proposal in strong terms which implied that the indictment charged that Orr was dishonest and had attempted to defraud local investors. Under the rule adopted by the American Law Institute and our own understanding of the protections of the first amendment, the newspaper's "opinion" about the meaning of the indictment cannot be made the basis of a libel suit against the newspaper.

**B. The First Amendment Principle Requiring "Actual Malice"**

■ If, on the other hand, we consider the allegedly defamatory words as "facts" rather than opinion, the issue becomes more clouded. If the plaintiff is a "public figure," misstatements of fact are not defamatory unless made with knowledge of their falsity or with a reckless disregard for the truth of the statements. *Gertz, supra,* 418 U.S. at 334-36 n.6, 94 S.Ct. at 3004-05 n.6, 41 L.Ed.2d at 802-03 n.6; *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967); *New York Times v. Sullivan, supra.* The standard is similar in

practice to the Michigan "fair comment" privilege. While the state standard emphasizes the subjective good faith of the publisher, the constitutional definition of malice is more concerned with showing the publisher's subjective reckless disregard for accuracy. It is theoretically possible, in other words, that a newspaper might subjectively believe in good faith that a statement is true under state law and, at the same time, publish the statement without sufficient regard for its truth under the first amendment. We do not believe the evidence is sufficient to support a finding of malice under either of the subjective tests. If we convert these subjective "malice" standards into a more objective test, as suggested by Deans Prosser and Wade and Justice Harlan, we find no evidence that the defendant was guilty of "highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers." *Curtis Publishing Co.,* 388 U.S. at 155, 87 S.Ct. at 1991 (Harlan, J.).

■■■ **1. Interpretation of Official Documents.**—A subsidiary first amendment principle concerns statements describing or summarizing official documents. In cases where the plaintiff is *a public figure* for the purpose of the "malice" standard, the Supreme Court has held in *Time, Inc. v. Pape,* 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971), that any rational interpretation of a public document is a sufficient defense as a matter of law to a suit for defamation. Specifically, the Court held in *Pape* that a newspaper's choice of one or several possible interpretations of an ambiguous government document is not enough to create a jury issue of "actual malice." The Court observed:

> [A] vast amount of what is published in the daily and periodical press purports to be descriptive of what somebody *said* rather than of what anybody *did.* Indeed, perhaps the largest share of news concerning the doings of government appears in the form of accounts of reports, speeches, press conferences, and the like.

The question of the "truth" of such an indirect newspaper report presents rather complicated problems.

.    .    .    .    .

> Where the document reported on is so ambiguous as this one was, it is hard to imagine a test of "truth" that would not put the publisher virtually at the mercy of the unguided discretion of a jury.

401 U.S. at 285–86, 291, 91 S.Ct. at 637, 28 L.Ed.2d at 51.

**2. The "Public Figure" Test.**—We believe that Orr is a "public figure" for the limited purpose of reporting on his arrest and indictment and the circumstances surrounding the collapse of his shopping mall proposal. Although not every lawyer and litigant involved in a judicial proceeding is a "public figure," according to the *Gertz* case and *Time, Inc. v. Firestone,* 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1975), it appears from the reasoning of these opinions that a criminal defendant would be classified as a "public figure" where, as here, his conduct in the community is a legitimate matter of public interest, the press has publicized his conduct in part as a result of his own efforts to obtain publicity, and his conduct has made him the target of a criminal proceeding about which the public has a need for information and interpretation.

There is no doubt that the development of a large shopping complex in the Owosso, Michigan, area was of interest and importance to the people of that region. The Argus Press had previously published—with Orr's cooperation—a front page story about the proposed mall and its developers. When the project later fell through amid charges of fraud and misrepresentation, certainly Orr was a "public figure" within the meaning of the test established in *New York Times, Butts, Gertz* and *Firestone.* He voluntarily sought publicity for his project and then found himself, through his own alleged misdeeds, at the center of a public scandal. We believe that application of the constitutional "actual malice" test is fully warranted under these circumstances and that the *Pape* decision protects the

newspaper from liability as a matter of law. The newspaper's interpretation of the indictment as implying that Orr was attempting a "swindle" or to "take" money from local investors is, as we have previously discussed, a rational interpretation of the charges.

## IV. POLICY REASONS JUSTIFYING PROTECTION OF THE PRESS UNDER THE MALICE STANDARD

This case demonstrates the need for principles of libel law which loosen the constraints that a standard of strict liability would otherwise impose on the press. The adverse publicity in this case arose because the state brought criminal charges against Orr for securities violations, not because the newspaper independently decided to investigate, embarrass, or invade the privacy of an individual about whose conduct the public has no legitimate need for information. Orr was charged with securities fraud in the development of a new center for public shopping in a small community and with misleading potential local investors.

The publicity which the press gives to such cases plays an important role in our system of criminal justice because it informs the public about the law, warns the public of harm and serves to deter law violations. The press functions in such cases as one of the sanctions in our system. Only by receiving information about our legal system, including its defects and mistakes, can the public learn about the law and the moral principles on which it is based, as well as the law's capacity for self correction and stability. In reporting on this case, therefore, the newspaper was simply performing its assigned role.

Like the readers for whom they write, few newspaper reporters are lawyers; yet they must often report under a short deadline complex accusations and arguments in colloquial language that the average reader can understand. Sometimes, as in this case, lawyers have spent hours preparing charges and arguments that the reporter must summarize in a few short paragraphs in a few minutes.

Because of the public importance of reporting on cases of this kind, the law must allow some leeway for misinterpretation and error. Lawyers and judges sometimes make mistakes about the facts of cases, misinterpret the law or state one side of the case too strongly or with words and labels which may be inappropriate. They are insulated from liability for such conduct by an *absolute* privilege, not a qualified privilege. For similar reasons, the common law, and the Supreme Court in construing the first amendment, have erected principles which protect the press from liability for mistakes when reporting on public proceedings, officials, and persons in whom the community has a legitimate interest and a need for information and interpretation. An individual's interests in privacy, a good reputation, honor and equanimity are important values which the law must continue to protect. These interests must give way in part, however, when the citizen's public deeds arguably harm or seriously affect the interests of a significant number of his fellow citizens.

The judgment below is therefore reversed and the case remanded to the District Court for dismissal of the action.