Richard BICHLER, Plaintiff-Appellant,

v.

UNION BANK AND TRUST CO., et al., Defendants-Appellees.

No. 82–1103.

United States Court of Appeals, Sixth Circuit.

Argued April 29, 1983.

Decided Aug. 17, 1983.

Rehearing Granted Oct. 6, 1983.

J.A. Cragwall, Jr., Warner, Norcross & Judd, Richard Bandstra, Grand Rapids, Mich. (argued), Grant J. Gruel, Cholette Perkins & Buchanan, Grand Rapids, Mich., for defendants-appellees.

Before JONES and WELLFORD, Circuit Judges, and WEICK, Senior Circuit Judge.

NATHANIEL R. JONES, Circuit Judge.

Richard Bichler, appellant and owner of a now defunct dinner theatre in Grand Rapids, Michigan, seeks reversal of a grant of summary judgment to defendant television station in this diversity action. Bichler contends (1) that the district court applied the wrong burden of proof by (a) finding that he was a public figure under the doctrine established in *Sullivan v. New York Times,* and (b) by holding that the events which were the basis of the controverted story were a "public controversy" under Michigan law; and (2) that in any event, summary judgment was inappropriate on the facts of this case. We believe that the trial court erred in granting summary judgment and reverse.

## I. FACTS

The events which surround the libel action which is the crux of this suit involve the Thunderbird Dinner Theatre. Richard Bichler, the plaintiff-appellant, was the principal stockholder and President of Rebel Promotions, the company which owned and operated the theatre. In addition, he was general manager of the theatre, selecting the shows, scheduling events and running it day to day. Bichler hired Jerry Moore's Playmore Productions to secure and present stage plays in the theatre. Under the contract, gross costs, travel expenses and lodging for the cast were to be paid by Moore.

The events here were precipitated when, on January 21, 1976, the theatre gave Jerry Moore a check for $9,000 for the services of the cast and for their expenses for the previous week. At about that time, a garnishment was served upon Bichler for indebtedness of Moore and his Playmore Production Company. That garnishment was

Wilson M. Jackson, Jackson & Laska, Dorsi Bosca, Warren, Mich. (argued), for plaintiff-appellant.

pursuant to a judgment rendered in Flint, Michigan. Further, Bichler evidently became aware that certain of Moore's invoices submitted for payment were not true invoices.

Bichler decided to place a stop order on the $9,000 check. Moore was notified and the ensuing discussion led to the cessation of the present production of "Hair" at the theatre. The disgruntled Moore called a news conference at the Presidential Inn in Grand Rapids on January 26, 1976. WZZM–TV, with whom Moore had communicated, was there.

According to the deposition of WZZM's newsman, James Rummel, the news conference began between 3:00 p.m. and 5:00 p.m. and there were several members of the cast, other than Moore, present. Moore told his staff in front of the camera that the present production would cease and that the next production would not begin on schedule. He stated that the show would not continue because the actors had not been paid. He did not contend that the theatre was closing down.

Later that evening, around 9:30, David Kowalczyk, a part owner of Rebel Productions (and thus business partner with Bichler), was informed that WZZM was to run a story about the theatre on the 11:00 newscast. He and his attorney went to the station to try to delay broadcast. There is some dispute about the content of that discussion. The appellant claims that Rummel was told that Moore was a known liar and that there would be a severe negative impact on the theatre if the story was aired. Rummel was allegedly asked to, at minimum, postpone the broadcast until Bichler's views could be ascertained. The defendant states that all that was said was that Kowalczyk wished that they would delay the story, as a favor, until he could check it out. Rummel was apparently in a hurry to broadcast and declined to postpone the story.[1]

The story ran on the 11:00 news as follows:

A report on the closing of the Thunderbird Dinner Theatre . . . .

And West Michigan's only dinner theatre locked its doors today . . . leaving a production company wondering what to do next . . . .

With no advance warning . . . the Thunderbird Dinner Theatre locked its doors today . . . leaving about 40 members of a New York based production company and advance ticket holders in the lurch.

When we got word of the closing, we drove out to the Thunderbird located north of Comstock Park on Alpine Avenue. All we found were locked doors and an empty parking lot.

The news of the closing was broken to the members of the current cast of "Hair" . . . by the show's producer, Jerry Moore.

The Thunderbird Theatre has been having financial problems in recent weeks as has its owner, Dick Bichler.

Today, it was Bichler who was catching the blame and the wrath of the cast.

The problem now becomes one of what to do for the members of the current production of "Hair" . . . and for the cast of the Theatre's next scheduled production, "Jesus Christ, Superstar." Most of them are without money and without plane tickets home . . . all of which Bichler had contracted for.

Bichler was unavailable for comment today . . . .

And there might be a few advance reservation holders who will be wanting their money back.

According to Moore, more than $3,000 in advance tickets has been sold to "Jesus Christ, Superstar" . . . to open January 28th.

---

1. The controversy surrounding this conversation emphasizes the impropriety of the district court's grant of summary judgment in this case. The content of the conversation was clearly material to the analysis of Rummel's state of mind. It is elementary that controverted material issues of fact are for the jury to resolve, and are not to be weighed by the court in a motion for summary judgment. Rule 56, Federal Rules of Civil Procedure. All allegations made by the nonmoving party, Bichler, should have been taken as true.

There is some dispute as to whether the logo "cooked chicken" was used as a preface to the story. The appellant contends that it was, the defendant-appellee contends that it was not and the district court found that it was nowhere in the record.

At the time the story was aired, the theatre had *not* closed. In fact, Bichler had merely halted the performance of "Hair" for reasons related to Moore's financial status and professional activities. In addition, the broadcast misstated the terms of the contract between the parties. Accordingly, it is obvious from the face of the broadcast text that it contained misstatements regarding the fact of the theatre's closing and the reasons for which the production of "Hair" was cancelled.

Within a day or two after the story was reported, a local bank called in its loan and repossessed items of personal property all of which were essential to the financial viability of the theatre. The theatre was then forced to permanently close its doors. This is the source of the present suit.

The evidence in the record suggests that James Rummel took several steps *before* the story aired. He interviewed Moore at the Presidential Inn, tried to contact Bichler at his home and at the theatre, went to the theatre, found the doors locked, and spoke with Kowalczyk. The next day, he checked the public records which showed that there were law suits against Bichler and some liens against Bichler's assets.

Included in the record in this case are 27 articles which were published in the *Grand Rapids Press* over the span of ten months after the theatre opened. Richard Bichler is mentioned in 14 of them, only ten have quotes from him. In addition, the articles are, on the whole, reviews of plays or statements about future productions. Bichler's private life is not mentioned to any degree in these articles. The theme of the articles show that Bichler, acting as manager of the theatre, informed the press about upcoming events and past successes and failures. Only after the incidents involved in this suit did Bichler comment on any other matters.

## II. DISPOSITION BELOW

The complaint filed in this diversity case alleged four causes of action arising out of the news report and the subsequent closing of the theatre. Two of the causes were barred by the Michigan statute of limitations, but two survived. The live issues included an invasion of privacy theory based on publicity given to a private life and publicly placing a person in false light. The underlying contention is that the broadcast invaded Bichler's privacy by discussing and/or implying that his financial affairs were not in order and that he had caused the cast to be without money and plane tickets home. Further, the story suggested that he would be unable to pay the advance ticketholders for the tickets held for the cancelled shows. The complainant also alleges that the story inaccurately reported that the theatre was closing when, in fact, only the play was closing.

Upon summary judgment motion filed by WZZM, the trial court granted the motion and dismissed the complaint. The court held that Bichler was a public person under *Gertz v. Robert Welch,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), and, as such, he had to show actual malice before succeeding in his false light claim. The evidence, it held, did not put a material fact in issue as to malice. In the alternative, the district court held that the Michigan "public controversy" doctrine would require actual malice even if Bichler was deemed a private person under the *Gertz* standard. Because we believe that the district court read the public figure doctrine too broadly and because we find that it failed to properly assess the need for actual malice under Michigan law, we reverse.

## III. OVERVIEW

Before moving to the discrete issues in this case, it is important to set out the analytic structure of the privilege issues. The plaintiff has alleged that there has been a violation of Michigan law with regard to publication of private information and placing a private individual in false light. The television station contends that

its publication is somehow privileged. The problem in these cases is in determining where the source of that privilege lies. In fact, there are two sources: the Constitution and state law.

The First Amendment has been read to impose limits upon state laws dealing with libel, slander and other privacy-related issues. This exception has been developed in order to protect the press from having to answer to too many suits, thus chilling its freedom to publish. The origin of this privilege, often called the *New York Times* rule, is *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). The *Times* rule, as expanded in *Gertz, supra,* states that it is a violation of the First Amendment to hold anyone liable for publication about a "public figure" on any standard less than one including "actual malice." The important issue here, of course, is what a "public figure" is for the purpose of the rule—this is the first issue in the case and is discussed in part IV.

■■■ The Constitution, however, only imposes this heavier burden for plaintiffs in "public figure" cases. Thus, as was made clear in *Gertz v. Robert Welch,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the *Times* privilege for newspapers and the like does not apply to private individuals. For these individuals, one must look to *state law privileges.* As noted in *Gertz,* "so long as they [states] did not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehoods injurious to a private individual." *Id.* at 347, 94 S.Ct. at 3010. *See also Schultz v. Newsweek,* 668 F.2d 911 (6th Cir.1982); *Ruby Clark v. ABC,* 684 F.2d 1208 (6th Cir.1982). Thus, if the individual does not fall within the "public figure" doctrine so as to afford the television station a privilege, we must look to state law to see whether a state law privilege arises. We deal with just this issue, i.e., whether as a matter of Michigan law the defendant-appellee is given a privilege to report on a private individual's affairs subject only to liability when "actual malice" is shown, in part V. Thus, the first issue is a federal constitutional issue, the second is a matter

of state law. It is also significant that *Gertz's* constitutional analysis does not shield the private citizen; rather, it leaves the degree to which the private citizen will enjoy a privacy interest free from newspaper and television invasion to the states.

The analytic framework of *this* case is as follows: the plaintiff alleges a violation of his Michigan common law right of (1) protection against publicity given to a private life and (2) freedom from being placed, by publicity, in a false light. The Restatement of Torts 2d defines each of these as follows:

Section 652 defines "Publicity Given to Private Life" as:

One who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter publicized is of a kind that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public.

Section 652E defines "Publicity Placing Person in False Light" as:

One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy if: (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

The Court determined, on summary judgment, that the plaintiff had failed to establish actual malice. The plaintiff now contests that holding, claiming that the "actual malice" standard only applies if the newspaper is found to have a privilege to publish the information. We must examine the potential sources of such a privilege on the facts of this case.

## IV. CONSTITUTIONAL ANALYSIS

In *Ruby Clark v. ABC,* 684 F.2d 1208 (6th Cir.1982), this Court recently reiterated the public figure doctrine. We noted that in *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Supreme Court recognized that publishers

and broadcasters could not be held liable in defamation actions brought by public *officials* unless the defendant had acted with actual malice. This doctrine was extended to public *figures* later in *Curtis Publishing Company v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). *See also, Gertz v. Robert Welch*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) [public figures may recover from injury to reputation only "on clear and convincing proof that the defamatory statement was made with knowledge of its falsity or with reckless disregard for the truth."]

■ Under the public figure doctrine, there are two kinds of public figures: "public personalities for all respects" and limited public figures. Defining the first group, the Supreme Court noted that it is a rather small group:

> For the most part those who attain this status have assumed roles of special prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment.

*Gertz*, 418 U.S. at 345, 94 S.Ct. at 3009. Further, "*absent* clear evidence of *general fame or notoriety* in the community, and pervasive involvement in the affairs of society, *an individual should not be deemed a public personality for all respects of life.*" *Id.* at 352, 94 S.Ct. at 3013 (emphasis added). *See also Clark supra.*

■ It is clear that Bichler is not a public figure for all purposes. He was the manager of a dinner theatre and a major shareholder in the parent corporation. Though he was quoted in the newspaper some 8–10 times, his personal life was never an issue. Rather, the articles clearly indicate that he was a spokesman for the business venture and the content of his public life was merely related to the schedules and facts about the dinner theatre. He is not an individual of fame or notoriety.

With regard to limited public figures, this Court, in *Clark*, noted that *Gertz* established a two-prong analysis. First, a "public controversy" must exist. *Clark*, 684 F.2d 1218; *Gertz*, 418 U.S. at 345, 94 S.Ct. at 3009. Second, the nature and extent of the individual's participation in the controversy must be ascertained. *Clark*, 684 F.2d at 1218; *Gertz*, 418 U.S. at 352, 94 S.Ct. at 3013.

The exact nature of a public controversy for First Amendment purposes is not clear. *See Clark*, 684 F.2d at 1218; *Street v. National Broadcasting Company*, 645 F.2d 1227 (6th Cir.), *cert. granted*, 454 U.S. 815, 102 S.Ct. 91, 70 L.Ed.2d 83, *cert. dismissed*, 454 U.S. 1095 (1981). Yet, it is clear that not "simply any controversy of general or public interest" will do. *Street*, 645 F.2d at 1235. In *Time v. Firestone*, 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976), the Supreme Court held that "dissolution of a marriage through a judicial proceeding is not the sort of public controversy referred to in *Gertz*." 424 U.S. in 454, 96 S.Ct. in 965.

■ The defendant urges that the closing of the dinner theatre was a public controversy within the meaning of *Gertz*. It relies on two propositions to support that conclusion: first, that the dinner theatre closing was of great public interest because it was the only dinner theatre in Grand Rapids; second, it relies upon *Orr v. Argus*, 586 F.2d 1108 (6th Cir.1978), *cert. denied*, 440 U.S. 960, 99 S.Ct. 1502, 59 L.Ed.2d 773 (1979). While we believe that the matters here do not constitute a public controversy within the *Gertz* standard (because there *was* no controversy about the finances or the viability of the theatre until the story), we need not dispose of that issue. For, even if the viability and financial health of the dinner theatre is deemed a public controversy, that does not require that Bichler becomes a public figure for all purposes. In *Clark*, we noted:

> Even though the subject matter of the broadcast may be the type of "public controversy" recognized in *Gertz*, the nature and extent of plaintiff's participa-

tion in this public controversy must still be examined. The nature and extent of an individual's participation is determined by considering three factors: first, the extent to which participation in the controversy is voluntary; second, the extent to which there is access to channels of effective communication in order to counteract false statements; and third, the prominence of the role played in the public controversy.

684 F.2d at 1218 (citations omitted). One must make this assessment because the degree to which the content of a news story is privileged will depend on whether it falls within the area or issue for which the individual is a public figure. In public controversy cases, the individual exposes him or herself to public scrutiny only insofar as he or she is related to the public controversy.

■ In *Virgil v. Time, Inc.*, 527 F.2d 1122 (9th Cir.1975), the Court noted the importance of this limited public figure notion:

> However, accepting that it is, as a matter of law, in the public interest to know about some area of activity, it does not necessarily follow that it is in the public interest to know private facts about the persons who engage in that activity. The fact that they engage in an activity in which the public can be said to have a general interest does not render every aspect of their lives subject to public disclosure. Most persons are connected with some activity, vocational or avocational, as to which the public can be said as a matter of law to have a legitimate interest or curiosity. To hold as a matter of law that private facts are also within the area of legitimate public interest could indirectly expose everyone's private life to public view.

With these principles in mind, it is clear that Bichler is not a public figure with regard to the private aspects of his life. Even if the theatre and its finances do constitute a public controversy, the statement about his personal finances is not related to that controversy. Though he may be in the limelight for his managerial functions at the theatre, he has not thrust his *private* financial life into the public eye. Nor is there any public interest in his own finances other than *this* story.

Assessing each of the three *Gertz* factors as enunciated in *Clark* makes the point clear. First, his role in the controversy is limited to his managerial functions at the theatre. Further, the business is not his own, though he owns a majority of stock in the parent corporation, and thus his personal finances are unrelated to the financial health of the theatre. Second, the plaintiff does not appear to have the kind of access to the media that *Gertz* would require *with respect to his personal financial matters.* There are no articles in the record about him as a financier, promoter or the like. Rather, he has had access to the media solely for the purpose of advertising and promoting the theatre business. In that sense, he is the mouthpiece of the company.

Finally, Bichler in no way can be viewed as having thrust his personal financial health into the public eye. He, if at all, merely has placed his duties as a manager and the business of the theatre before the public. He has never placed his personal life in the public view.

In short, though there may be a claim that Bichler is related to a public controversy, he is not related in a manner which would make him a public figure for the purpose of discussion of his private financial affairs. We hold, then, that the "public figure" doctrine does not afford a privilege to the station when reporting on Bichler's personal affairs. As such, unless it can establish *a state law privilege,* the plaintiff should not have been required to make a showing of actual malice. The district court, then, erred in this regard.[2]

---

**2.** The appellees' argument appears compelling because it blurs the distinction between being a *public figure for all purposes* and being a *public figure for a limited purpose.* Here, there is no evidence to show that Bichler was a public figure for the purpose of discussion of his financial affairs. With this in mind, the cases cited by the appellees do not support the proposition they need to succeed. In *Steaks Unlimited v. Deaner,* 623 F.2d 264 (3rd Cir.1980), the strongest case for their position, the court expressly noted that "Steaks so thrust himself into the purview of the Pittsburgh area public

## V. STATE LAW ANALYSIS

Since the district court erred in its holding that the constitutional "public figure" doctrine afforded the defendant station a privilege, its alternative holding that actual malice is required by state law must be examined. This is a much more difficult issue but we believe that the district court did err in holding, as a matter of Michigan law, that actual malice must be shown.

There is no doubt that Michigan recognizes some privilege for newspapers who publish stories about private individuals involved in public issues. *Peiser v. Detroit Free Press,* 82 Mich.App. 153, 266 N.W.2d 693 (Mich.1978); *Schultz v. Newsweek,* 668 F.2d 911 (6th Cir.1982) [applying Michigan law]; *Ruby Clark v. ABC,* 684 F.2d 1208 (6th Cir.1982) [applying Michigan law]. The important issue here is the scope of that privilege. The appellant contends that even if there is a story of public interest here, the matters he complains about (the reference to his financial affairs), are not within the scope of that privilege. We agree.

In *Peiser,* the Michigan court of appeals traced the history and purpose of the privilege:

> Qualified privilege of a newspaper to report on matters of public interest was held to exist in *Lawrence v. Fox,* [357 Mich. 134, 97 N.W.2d 719.] Although that case involved an article charging a public official with fraud and corruption, it is clear that it was not limited to publications concerning public officials:

This defense rests upon considerations of public policy. "The great underlying principle upon which the doctrine of privileged communication stands," we held in *Bacon v. Michigan Central R. Co.,* 66 Mich. 166, 169, 170, 33 N.W. 181, is public policy.

\*     \*     \*     \*     \*     \*

The privilege thus afforded is not, however, as the mathematicians would put it, a constant. It varies with the situation, with what is regarded as the importance of the social issues at stake. At one extreme we have loose gossip, thoughtless or malevolent. Here the damage to the individual's reputation is balanced only against the social desirability of the unbridled tongue, the frenetic lashings of the scorpion's tail. Under the statutes of Edgar and Canute the tongue itself was forfeited. Modern law is more lenient. We class it simply as a case of "no privilege" and leave the parties to their proofs. At the other extreme are those occasions wherein the social interest involved in publication is so great as to immunize even deliberately malicious attacks upon one's character. Thus of judicial utterances, "A communication absolutely privileged—as, for instance, words spoken by a judge in his judicial capacity in a court of justice—is not actionable even though spoken maliciously." \* \* \* So, also, of words spoken in the course of legislative debate.

*Consideration of social policy similar in principle, but of lesser intensity, result in*

---

that the company can be characterized as a public figure for *purposes of the controversy giving rise to this litigation.*" 623 F.2d at 273 (emphasis added). The facts of that case are distinguishable in just that way: there, the controversy upon which the suit was based was the representations made about the quality of beef used by the company. The veracity of the individual was relevant to that concern. Here, Bichler's personal finances cannot be construed as related to the controversy in which he can be considered a public figure.

*Orr v. Argus,* 586 F.2d 1108 (6th Cir.1978), is mischaracterized by the appellees. The appellees contend that Judge Merritt found the plaintiff to be a public figure because he was involved in a shopping mall proposal and had

thus thrust himself into the limelight. A close reading, however, shows that the issue there was whether the plaintiff's being involved in a criminal proceeding took him out of the *Firestone* holding that mere involvement in a judicial proceeding is not enough to make one a public figure. The remarks about the mall proposal were to show that the plaintiff had been in the public eye for other matters which were ultimately to make him a target of the criminal investigation. The rest of the opinion discusses the policy behind needing to make the criminal matter public. In sum, *Orr* does not stand for the proposition, as the appellees contend, that one who advertises his business becomes a public figure for the purpose of his personal affairs.

*a privilege not absolute but conditional, or, as sometimes put, qualified, or defeasible. These situations are of a great variety,* all of them responding more or less directly to Baron Parke's famous statement in *Toogood v. Spyring* (Ex. 1834), 1 CM & R 181, 193 (149 Eng.Rep. 1044) *that a publication is privileged when it is "fairly made by a person in the discharge of some public or private duty, whether legal or moral, or in the conduct of his own affairs, in matters where his interest is concerned." These are the occasions in which one has not an absolute but a limited immunity to speak or publish words in and of themselves defamatory.* 357 Mich. at 137–139, 97 N.W.2d at 721 (footnotes and citations omitted).

82 Mich.App. at 161–63, 266 N.W.2d at 697–98 (emphasis added).

This Court has considered this privilege twice in the past two years. In *Schultz, supra,* we recognized the privilege and considered what was required to show actual malice. In *Clark, supra,* we considered the scope of the privilege in a different context. There, the plaintiff had been pictured in a story involving alleged prostitution aired on television. She was neither a prostitute nor a resident of the area in which the photo was taken. She sued for damages incurred from her being associated with the story.

In *Schultz,* Judge Keith, writing for the court, noted that once there is a determination that the occasion reported is privileged as being in the public interest, "the court must next determine whether the allegedly defamatory statement is within the scope of the qualified privilege." 684 F.2d at 1215. Further, he noted:

> In *Timmis v. Bennett,* 352 Mich. 355, 89 N.W.2d 748 (1958), the Michigan Supreme Court adopted the following statement from 33 Am.Jur., Libel and Slander § 126:
>
> > The essential elements of a conditionally privileged communication may accordingly be enumerated as good faith, an interest to be upheld, *a statement limited in scope to this purpose,* a proper occasion, and publication in a proper manner and to proper parties only.

*Id.* at 369, 89 N.W.2d at 755. The plaintiff in *Timmis,* a police officer, claimed that statements made concerning the performance of her official duties were defamatory. The court held that the statements were within the scope of the qualified privilege because of the public's interest in law enforcement matters and the actions of members of the police department. *Id.*

We believe that the remarks here are not within the scope of the privilege. In order for Bichler's financial affairs to be the subject of the public interest privilege, there must be some logical connection to the story about the *theatre's* troubles. We can find none. First, he was not the outright owner. Nor had he personally guaranteed the payment of the actors' salaries. Second, he was not so involved in the public view with regard to the theatre that his personal life was of interest apart from the manner in which it was related to the theatre.

This conclusion is based upon reasoning similar to that used in *Clark.* There, we wrote:

> The qualified privilege does not extend, however, to plaintiffs who are not the focus of the alleged public interest publication. A plaintiff who is merely an incidental figure in the broadcast is not, as a matter of law, within the scope of the privilege. See *Timmis,* 352 Mich. at 369, 89 N.W.2d 748. The policy underlying Michigan's qualified privilege is to promote reporting and comment about matters which are in the public interest. *Lawrence v. Fox,* 357 Mich. 134, 97 N.W.2d 719. If an individual is involved in some activity or proffers an opinion which is in the public interest, then a news story concerning that individual's activity or opinions is also in the public interest.
>
> The same considerations do not apply where the plaintiff has only the most tenuous connection with the public interest subject matter. A newspaper or television broadcast concerning this incidental plaintiff is not in the public interest. The societal interests which the privilege

protects are not furthered by expanding the scope of the privilege to include such individuals. Consequently, the scope of Michigan's qualified privilege does not encompass publications or broadcasts where the plaintiff is not the focus of the public interest publication.

684 F.2d at 1216.

Similarly, when the individual is in fact connected to the public issue in a nontenuous manner, one must be careful to draw the scope of the privileged topics only as broad as needed to effect adequate and careful airing of the issue. The *Peiser* court noted that the state law privilege is a balancing between private interests and the public need to know. Topics only marginally, if at all, incidental to the public issue, as those here with regard to Bichler's private financial affairs, are not privileged. Since the district court erred in holding the privilege applicable, thus erroneously placing the burden of showing actual malice on the plaintiff, the grant of summary judgment

must be reversed. We remand the case for additional proceedings not inconsistent with this opinion.[3]

It is so ORDERED.

WELLFORD, Circuit Judge dissenting.

I must respectfully dissent from the majority's analysis and treatment of appellant's claim under Michigan law. I would hold that the broadcast was privileged as a report on a matter of public interest concerning a private plaintiff.

The majority cites *Clark v. ABC,* 684 F.2d 1208 (6th Cir.1982), as requiring the plaintiff to have sufficient connection to the matter of public interest which is the subject of the broadcast in order to fall within Michigan's qualified privilege, indeed, as requiring the plaintiff to be the focus of the public interest publication. Assuming the correctness of such an interpretation of Michigan law,[1] I cannot agree with the majority's conclusion that appellant Bichler had insufficient connection to the contro-

---

**3.** We also reject the district court's analysis of the public disclosure of private facts issue. The district court held that the defendant had only publicized what was already a matter of public record—allegedly because the liens and the law suits were matters of public record. This was error.

In *Cox Broadcasting v. Cohn,* 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975), the Supreme Court recognized the public records privilege. Yet, that privilege cannot extend, on its rationale, to this case. In *Cox* and cases which have followed *Cox,* the plaintiff complained of dissemination of particular facts which were a matter of public record. Here, no such dissemination occurred: the existence of tax liens and law suits was never mentioned. Rather, the station broadcast a statement, that Bichler was in financial difficulty, which was its own opinion based upon conclusions about the public records. Such statement, without any mention of the underlying facts which are the public records so that individuals can decide whether the comment is accurate, cannot fall within the *Cox* rationale:

In the first place, in a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to bring to him in convenient form the facts of those operations. Great responsibility is accordingly placed upon the news media to report fully and accurately the proceedings of government,

and official records and documents open to the public are the basic data of governmental operations. Without the information provided by the press most of us and many of our representatives would be unable to vote intelligently or to register opinions on the administration of government generally.

\* \* \* \* \* \*

By placing the information in the public domain on official court records, the State must be presumed to have concluded that the public interest was thereby being served. Public records by their very nature are of interest to those concerned with the administration of government, and a public benefit is performed by the reporting of the true contents of the records by the media. The freedom of the press to publish that information appears to us to be of critical importance to our type of government in which the citizenry is the final judge of the proper conduct of public business. In preserving that form of government the First and Fourteenth Amendments command nothing less than that the states may not impose sanctions on the publication of truthful information contained in official court records open to public inspection.

420 U.S. at 492–95, 95 S.Ct. at 1044–46.

**1.** A reading of Michigan caselaw reveals little basis for the *Clark* court's addition of this requirement to Michigan's qualified privilege. *See Clark v. ABC,* 684 F.2d 1208, 1223 (6th Cir.1982) (Brown dissent).

versy surrounding the closing of the Theater.

In newspaper articles regarding the Theater, Bichler assumed a prominent role as spokesperson for the Theater. He was described in many articles as owner and general manager, and was quoted extensively. He was closely associated with the Theater; his views on the Theater's operations were actively solicited by and freely given to the media. The majority attaches much significance to the fact that the Theater was operated by a corporation in which Bichler was merely a majority stockholder. It is clear, however, that Bichler was the virtual personification of the Theater so far as the public was concerned. His financial investment made the Theater run, his decisions governed the operation of the Theater, he spoke on behalf of the Theater and he actively sought publicity for it. The success or failure of the theatre was of vital import to him.

Bichler's "nexus" with the controversy surrounding the closing of the Theater may be compared with that in *Orr v. Argus-Press Co.*, 586 F.2d 1108 (6th Cir.1978). In *Orr*, the plaintiff was an attorney who was president of a development company that proposed to build a shopping mall in Owasso, Michigan. A newspaper article alleged that he had been indicted for fraud in connection with efforts to attract investors in the mall project. This court found that there was "no doubt" that the development of the mall was of interest and importance to the community, just as the Theater in the instant case, as the only dinner theater in the area, was of interest to the Grand Rapids community. The court found that the Michigan qualified privilege applied and additionally that the plaintiff was a public figure for a limited purpose under First Amendment analysis. It noted that the defendant newspaper had previously published, with the plaintiff's cooperation, a front page story about the proposed mall and its developers. The court observed that the plaintiff had voluntarily sought publicity for his project and then found himself at the center of a public scandal. Thus, Bichler's actions prior to the broadcast in question are quite analogous to the activities of the plaintiff in *Orr*, found by this court to be sufficient to fall within the Michigan privilege. *See also Schultz v. Newsweek*, 481 F.Supp. 881 (E.D.Mich.1979) *aff'd* 668 F.2d 911 (6th Cir.1982). The facts in this case with regard to Bichler's nexus and reasonable connection with the matters concerning the controversy with Moore and the closing of the theatre differ materially from the tenuous connection between the plaintiff and the public controversy in *Clark v. ABC, supra.* Clark, it should be emphasized, *never sought* any kind of publicity.

I do not understand that the majority has decided that there is no "public controversy" in this case within the meaning of the First Amendment. The majority opinion, rather, acknowledges that even under *Clark v. ABC, supra,* upon which it principally relies, "the exact nature of a public controversy for First Amendment purposes is not clear." The majority determined that it was not necessary to "dispose of that issue." I agree with the latter conclusion, but would not concur with the statement, made by way of dictum, that "the matters here do not constitute a public controversy within the *Gertz* standard."

Accordingly, I would affirm the district court's entry of summary judgment against appellant.